T.C. Memo. 1997-400


UNITED STATES TAX COURT


CARL E. JONES AND ELAINE Y. JONES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 23676-93.                    Filed September 10, 1997.


<u>William E. Frantz</u> and <u>John B. Grattan</u>, for petitioners.

<u>Eric B. Jorgensen</u>, for respondent.


MEMORANDUM OPINION

PARR, <u>Judge</u>:  Respondent determined deficiencies in, and penalties on, the Federal income tax for 1989, 1990, and 1991 of Carl E. Jones (petitioner) and Elaine Y. Jones (Mrs. Jones) as follows:

|       |            | Accuracy-Related Penalties |
| Year  | Deficiency | Sec. 6662                  |
|-------|------------|----------------------------|
| 1989  | $210,819   | $42,164                    |
| 1990  | 125,150    | 25,030                     |
| 1991  | 90,018     | 18,004                     |

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. All dollar amounts are rounded to the nearest dollar, unless otherwise indicated.

After concessions,[1] the issues for decision are: (1) Whether petitioner received taxable distributions from Carl E. Jones Development, Inc. (Development), of $307,976, $261,591, and $224,827, in 1989, 1990, and 1991, respectively. We hold petitioner received distributions from Development the character and amounts of which are set out below. (2) Whether petitioner had sufficient basis in Development's indebtedness to him to deduct pass-through losses of $163,487 and $21,022 in 1990 and 1991, respectively. We hold he did not. (3) Whether petitioners had constructive dividend income of $80,051 in 1989 from either INI, Inc. (INI), or Spalding Partners, Ltd. (Spalding). We hold they did not. (4) Whether petitioner received constructive

---

[1] Petitioners reported $66,299 of taxable interest income on their return for 1989. Prior to trial, petitioners conceded that the correct amount is $80,120. Petitioner reduced his shareholder loan account balance with Carl E. Jones Development, Inc., for a payment of $54,369 that he made in 1990; respondent concedes on brief the allowance of this payment.

dividends of $314,504, $27,298, and $116,163 in 1989, 1990, and 1991, respectively, from INI.  We hold petitioner received distributions from INI the character and amounts of which are set out below.  (5) Whether petitioners realized a $28,248 loss from a nonbusiness bad debt in 1991.  We hold they did not.  (6) Whether petitioners are liable for an accuracy-related penalty pursuant to section 6662 for 1989, 1990, and 1991.  We hold they are.  (7) Whether Mrs. Jones qualifies as an innocent spouse under section 6013(e) for 1989, 1990, and 1991.  We hold she does not.[2]

Some of the facts have been stipulated and are so found. The stipulated facts and the accompanying exhibits are incorporated into our findings by this reference.  At the time the petition in this case was filed, petitioners resided in Atlanta, Georgia.

---

[2]  Respondent determined that for the years at issue certain computational adjustments should be made, which would: (1) Preclude petitioners from taking a deduction for medical and dental expenses, (2) reduce petitioners' itemized deductions, (3) disallow petitioners' deduction for exemptions, and (4) preclude petitioners from claiming the Earned Income Credit.  These are mathematical adjustments that the parties can make in their Rule 155 computation.

In addition, in the notice of deficiency respondent disallowed petitioners' claimed loss of $5,700 from the sale by Development of certain business property and determined that petitioners had a gain of $8,921 from that sale.  Respondent's determination is presumed correct, and petitioners bear the burden of proving otherwise.  Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).  Petitioners did not address this issue at trial or on brief; thus, petitioners have failed to meet their burden of proof.  Accordingly, respondent is sustained on this issue.

For convenience, we present a general background section and combine our findings of fact with our opinion under each separate issue heading.

## General Background

A. Petitioners

Petitioners are married and filed joint Federal income tax returns (Form 1040) for 1989, 1990, and 1991 with the Internal Revenue Service Center in Atlanta.

During the years at issue, petitioner was a realtor, a real estate developer, and an investor in real estate. He owned and operated several companies that built townhouses and expensive homes, and he engaged in other real estate development activities. Petitioner attended 2 years of law school but did not pass the bar exam.

Mrs. Jones is a mother and a homemaker. At the time of trial, petitioners had two children, a daughter and a son, 21 years and 8 years of age, respectively. During the years at issue, Mrs. Jones received $3,000 each month from petitioner which she used to pay for utilities and food.

Mrs. Jones has long suffered from Raynaud's disease. As a result of this disease, she had surgery on her feet in 1988 and again in 1991. During the 1988 surgery, Mrs. Jones contracted a staph infection that complicated her medical condition and eluded detection until 1991.

Petitioners separated temporarily in September of 1991 and reunited in May of the following year. During the separation,

Mrs. Jones received $150,000, which she had in a bank account in her name at the time of trial.

B.  The Corporations

During the 3 years at issue, petitioner was the sole shareholder and president of INI, a C corporation, and of Towergate Townhomes, Inc. (Towergate), and Development, which are both S corporations.  Also during this time, petitioner and Mrs. Jones were each 50-percent owners of Carlsgate Properties, Inc. (Carlsgate), an S corporation.  During 1989 and 1990, petitioner was president and owner of Winterchase Townhomes, Inc. (Winterchase), a C corporation.

INI

INI operated as a developer of real estate and managed a 60,000-square-foot building that was developed by a related C corporation, Spalding.

INI was incorporated on June 25, 1984, at which time it issued 1,000 shares of stock--500 to petitioner and 500 to Ronald Cates (Cates).  When INI was incorporated, petitioner and Cates each owned 50 percent of Spalding.  Spalding operated as a holder of raw land and a developer of real estate.

On November 1, 1984, petitioner and Cates transferred all of their shares in INI to Spalding, and INI became a wholly owned subsidiary of Spalding.  Thus, petitioner and Cates each owned 50 percent of Spalding, and Spalding owned 100 percent of the INI shares outstanding.

From its inception, Spalding filed its returns on the basis of a fiscal year ending on September 30. When Spalding became the 100-percent owner of INI, Spalding and INI elected to file consolidated returns using Spalding's September 30 fiscal year.

In 1988, petitioner and Cates reached an impasse as to the business direction of Spalding and INI. They agreed to dissolve their business relationship according to the terms set forth in the Shareholders' Agreement and Plan of Reorganization (the Agreement) that they signed on September 29, 1988, and the Agreement to Amend the Agreement (the Amendment) signed on March 1, 1989. The Agreement was executed to separate Spalding and INI pursuant to section 355.[3]

After the Amendment was executed, Spalding disposed of its interest in a general partnership that was engaged in providing parking services at an airport and transferred $80,051 to INI as part of the division of corporate assets. See INI, Inc. v. Commissioner, T.C. Memo. 1995-112, affd. without published opinion 107 F.3d 27 (11th Cir. 1997).

At the time of the separation, Spalding had on its books and records accounts in which it recorded the loans the corporation

---

[3]    In INI, Inc. v. Commissioner, T.C. Memo. 1995-112, affd. without published opinion 107 F.3d 27 (11th Cir. 1997), this Court found that by proxies executed on Sept. 29, 1988, petitioner had transferred his right to vote his Spalding stock to Cates, and Spalding had irrevocably transferred its exclusive right to vote its INI stock to petitioner. We held, therefore, that as of Sept. 29, 1988, Spalding and INI were no longer affiliated as defined in sec. 1504(a) and were not permitted to file a consolidated return.

had made to its shareholders. Spalding had lent petitioner a total of $128,429 at the time of the splitup. As part of the Agreement, Spalding transferred the loan account with the balance owed by petitioner to INI. INI added the balance of the transferred account to the receivables account it maintained on its books for the loans that it had made to petitioner for the fiscal year ending September 30, 1988.

After the separation, petitioner became the president and sole shareholder of INI, and Cates became the sole shareholder of Spalding.

### Development

Development was primarily engaged in building single-family homes. Development was incorporated as a C corporation in 1973, elected to be an S corporation in 1986 and ceased doing business in 1991. For the years at issue, Development had a taxable year ending September 30. Development was owned entirely by petitioner, who was also its president.

### Carlsgate

Carlsgate was the marketing arm for the properties built by Development. Carlsgate was incorporated in 1984, elected S corporation status in 1987, and filed its final return in 1991. Petitioner was the president of Carlsgate from its inception.

### Towergate

Towergate was a project of approximately 70 townhouses built in the mid-1980's that sold for prices ranging from $72,000 to

$94,000. Towergate was incorporated in 1981 and elected S corporation status in 1986. During its taxable years ended October 31, 1989 through 1992, petitioner was president and sole stockholder of Towergate.

### Winterchase

Winterchase Townhomes was a 40-unit townhouse project in which only 34 units were completed. Winterchase was incorporated in 1983, and was liquidated on or about September 30, 1990. During its taxable years ended September 30, 1989 and 1990, petitioner was president and sole stockholder of Winterchase.

### C. The Accountants

Petitioner employed an in-house bookkeeper, Sawat Lavantucksin (Lavantucksin) to maintain his personal books and his corporations' books. Under the direction of petitioner, Lavantucksin prepared the records of the cash transactions and the monthly bank statements and made the journal entries recording the amounts the corporations lent to petitioner, the amounts petitioner repaid to the corporations, petitioner's alleged assumptions of the corporations' indebtedness, the transfers of the indebtedness between the corporations, and the transfers between the corporations and petitioner. Lavantucksin did not testify at the trial.

Petitioner employed a certified public accountant, Donald L. Ricks (Ricks), to prepare his personal and corporate returns. Ricks, or his employee, William Morrisett (Morrisett), checked

the entries that were made by Lavantucksin on the corporate books for consistency against the entries that were made by Lavantucksin on petitioner's personal books. The accountants then prepared the returns by using the journal entries. Neither Morrisett nor Ricks verified Lavantucksin's entries by examining the corporate minutes, bank statements, canceled checks, or other external sources.

D.   Transfers by Journal Entries

Petitioner transferred debt between himself and his corporations in two general circumstances. In one circumstance, petitioner was indebted to one of his corporations, and the corporation was going out of business. In this circumstance, petitioner used journal entries to transfer his indebtedness from the corporation that was going out of business to another of his corporations. For instance, petitioner made withdrawals from Winterchase that were recorded on its books as loans. On December 31, 1989, when Winterchase was going out of business, petitioner's accountants transferred petitioner's $98,753 of indebtedness from Winterchase to Development by making journal entries on each of the corporation's books.

In another circumstance, one of petitioner's corporations was indebted to another of his corporations, and the debtor-corporation was going out of business. In this circumstance, petitioner "assumed" the latter corporation's indebtedness to the other corporation. For instance, in late 1990 Development was

going out of business and was indebted to INI for $417,978.  The accountants transferred the $417,978 of indebtedness to petitioner by journal entries, such that after the transfer Development was no longer indebted to INI, petitioner's indebtedness to INI was increased by $417,978, and petitioner's indebtedness to Development was reduced by $417,978.

Similarly, Development owed Carlsgate $82,132 at about the time that Carlsgate was going out of business, and petitioner was indebted to Development.  On December 31, 1989, petitioner "assumed" Development's debt to Carlsgate by making journal entries.  After the journal entries, Development was no longer indebted to Carlsgate, petitioner owed Carlsgate $82,132, and his indebtedness to Development was reduced by that same amount.  On that same day, petitioner incorrectly "paid" $59,369 of the amount he owed Carlsgate by making creative journal entries that offset the Accumulated Adjustments Account (AAA) against the loan balance.[4]

On December 31, 1990, in anticipation of Carlsgate's imminent demise, petitioner transferred $11,374 of the amount he owed Carlsgate to INI by making journal entries.  That is, after the journal entries, his indebtedness to Carlsgate was reduced by

---

[4]  Petitioner first reduced the loan balance by offsetting $74,397 against the AAA, but then reduced that offset by $15,028 to agree with his amended Schedule K-1 (Form 1120S).  Thus, the net offset was $59,369.

$11,374, and his indebtedness to INI was increased by that same amount.

When Carlsgate went out of business in 1991, petitioners each reported one-half of the remaining loan balance, $5,131 (total $10,262), as long-term capital gain income from the exchange of their stock.

Through a series of similar assumptions and transfers executed by journal entries, on December 31, 1991, petitioner was indebted to INI, his sole remaining corporation, for $980,527.

Issue 1. Whether Petitioner's Withdrawals From Development in 1989, 1990, and 1991 Were Taxable Distributions

Respondent determined that Development made distributions to petitioner that exceeded his stock basis by $298,622, $261,591, and $224,827 for 1989, 1990, and 1991, respectively. In addition, respondent determined that in 1989 petitioner received $8,854 of dividends that Development distributed from its C corporation accumulated earnings and profits. Petitioner asserts that with respect to all of the years at issue, the withdrawals were loans that Development made to him.

1989

On January 1, 1989, Development had $8,854 of accumulated earnings and profits on its books and records that it earned when it was a C corporation. According to the loan summary prepared by petitioner's accountants, the 1989 beginning balance in Development's loans to shareholder account was $427,368.

Respondent determined that during 1989, the reported increases (debits) to the loan account totaled $537,683. The account was increased for such diverse items as cash withdrawals of $209,223 that were recorded as loans,[5] Development's assumption of petitioner's $98,753 of indebtedness to Winterchase, and $39,038 of capitalized interest.[6]

Petitioner also recorded items that decreased the account (credits). Petitioner had credited the account for, among other items, $237,269 of cash that petitioner paid into the company, the reclassification of $116,395 of the loans as petitioner's salary, and petitioner's assumption of Development's indebtedness. Respondent disallowed $490,402 of these credit items, and allowed credits totaling $391,195, which respondent applied to reduce the beginning balance of the loan account, not to offset the increases recorded during 1989.

Respondent determined that the alleged shareholder loans were not bona fide but actually were disguised distributions. Accordingly, respondent reduced the loan account balance for $39,038 of capitalized interest and increased petitioners' gross income for $307,976, the amount of the disguised distributions.

---

[5]   This amount includes political contributions of $1,500 that Development paid on petitioner's behalf.

[6]   Development charged petitioner interest on the alleged loans, and when petitioner did not pay the interest due, Development capitalized it by debiting the loan account for the unpaid amount.

Of the $307,976,[7] respondent determined that $8,854 was a dividend paid from the C corporation accumulated earnings and profits, $500 was a nontaxable return of petitioner's stock basis, and the $298,622 balance was capital gain income.

Respondent adjusted the balance of the loan account to reflect the determinations; that is, respondent recalculated the balance to reflect the repayments of the prior year's loans but did not increase the balance for the alleged loans made to petitioner during the current year nor reduce it for petitioner's alleged assumption of Development's debts. The ending loan account balance calculated by respondent was $36,173; the balance on Development's records was $88,077. Thus, the ending loan balance calculated by respondent was less than the balance on Development's books and records. Finally, respondent adjusted Development's AAA to restore the correct balance, $76,000, as reported on Development's amended return.

<u>1990</u>

Respondent allowed $527,318 of the debits (increases) that were recorded in the account during 1990 and disallowed $22,259. Respondent allowed $301,900 of the credits (decreases) that were recorded in the account and disallowed $681,706.

Among the disallowed amounts were $479,035 of credits recorded for petitioner's alleged assumption of Development's

---

[7] This amount is the sum of petitioner's cash withdrawals and his indebtedness to Winterchase.

indebtedness; $417,978 that Development owed to INI; and $61,057 that it owed to Towergate.

Respondent also disallowed a $54,369 credit recorded for petitioner's payment of Development's indebtedness that petitioner did not substantiate[8] and disallowed credits totaling $115,725 that were for petitioner's unverified deposits in the corporate account.

Respondent determined that Development distributed $527,318 to petitioner, and that he paid a total of $301,900 into the corporation. Respondent applied the amounts paid to the corporation first to the beginning loan balance, which according to respondent's calculations was $36,173, and the remainder as an offset to the current year withdrawals, for a net distribution of $261,591.

Respondent determined that the distributions made to petitioner in 1989 had exhausted Development's accumulated earnings and profits and also consumed petitioner's stock basis. Thus, respondent adjusted petitioners' 1990 income for capital gains in the amount of the net distribution made by Development in 1990, $261,591. Petitioner asserts, inter alia, that he assumed Development's indebtedness as represented in the loan account summary.

---

[8]     At trial, petitioner introduced a copy of a check signed by Mrs. Jones made to Cobb Commercial Bank for $54,369. Respondent concedes on brief that the amount of the check will be allowed as a credit for 1990. See supra note 1.

1991

Respondent determined that in 1991, petitioner withdrew $267,628, all of which had been recorded as increases to the loan account,[9] and that he paid $42,801 to the corporation. Thus, respondent increased petitioners' 1991 income for capital gains in the amount of the net distribution, $224,827. In making the determination, respondent disallowed decreases to the loan account for unverified payments totaling $56,041 that petitioner asserts he made on behalf of Development.

Petitioner asserts that the withdrawals he made in 1989, 1990, and 1991 were loans. However, during the years at issue he never executed any promissory notes in favor of Development for the funds he withdrew. Furthermore, although the corporation charged him interest on the withdrawn amounts, petitioner never actually paid any interest. The unpaid interest was capitalized to the loan account balance. Development never placed a limit on the amounts petitioner could withdraw nor specified a repayment schedule for the withdrawals. Finally, the withdrawals were not secured or collateralized.

Distributions Versus Loans

We must determine whether petitioner's withdrawals were bona fide loans, as petitioner contends, or disguised

---

[9] Of the amounts recorded as an increase in the loan account, $850 was for the transfer of a facsimile machine to petitioner.

distributions taxable as provided under section 1368, as respondent contends.[10]

The burden of proof is on petitioners to show that the amounts at issue were bona fide loans and not taxable distributions.  Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).  We also note that we have always examined transactions between closely held corporations and their shareholders with special scrutiny.  Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1339 (1971), affd. without published opinion sub nom. Jiminez v. Commissioner, 496 F.2d 876 (5th Cir. 1974).

A transfer of money is a loan for Federal income tax purposes if, at the time the funds were transferred, the transferee unconditionally intended to repay the money, and the transferor unconditionally intended to secure repayment.  Haag v. Commissioner, 88 T.C. 604, 615-616 (1987), affd. without

---

[10]    Sec. 1368 provides in the case of an S corporation which has accumulated earnings and profits that the portion of any distribution of property which is made with respect to its stock and which does not exceed the AAA shall not be included in gross income to the extent that it does not exceed the basis of the stock.  Sec. 1368 (a), (b)(1), (c)(1).  If the amount of the distribution exceeds the basis of the stock, it shall be treated as gain from the sale or exchange of property.  Sec. 1368(b)(2). The portion of the distribution that remains after depletion of the AAA shall be treated as a dividend to the extent it does not exceed the accumulated earnings and profits of the S corporation. Sec. 1368(c)(2).  The portion of the distribution that remains after depletion of the AAA and depletion of the accumulated earnings and profits shall not be included in gross income to the extent that it does not exceed the remaining adjusted basis of stock.  If the amount of the distribution exceeds the basis of the stock, such excess shall be treated as gain from the sale or exchange of property.  Sec. 1368(c)(3), (b).

published opinion 855 F.2d 855 (8th Cir. 1988); Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973); see also Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970); Saigh v. Commissioner, 36 T.C. 395, 419 (1961).

Thus, for petitioners to exclude the amounts received from Development, petitioners must prove that at the time of each withdrawal, petitioner unconditionally intended to repay the amounts received and the corporation unconditionally intended to require payment. Rule 142(a); Haag v. Commissioner, supra at 615-616; Miele v. Commissioner, 56 T.C. 556, 567 (1971), affd. without published opinion 474 F.2d 1338 (3d Cir. 1973).

Although petitioner asserts that the withdrawals were loans, a mere declaration by a shareholder that he intended a withdrawal to constitute a loan is insufficient if the transaction fails to exhibit more reliable indicia of debt. Williams v. Commissioner, 627 F.2d 1032, 1034 (10th Cir. 1980), affg. T.C. Memo. 1978-306; Alterman Foods, Inc. v. United States, 505 F.2d 873, 877 (5th Cir. 1974).[11]

Whether shareholder withdrawals are bona fide loans is a question of fact, the answer to which must be based upon a consideration and evaluation of all surrounding circumstances. Alterman Foods, Inc. v. United States, supra at 875. Courts have

_____

[11]  In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Court of Appeals for the Eleventh Circuit adopted as binding precedent all of the decisions of the former Court of Appeals for the Fifth Circuit handed down prior to the close of business on Sept. 30, 1981.

considered the following factors in deciding whether

distributions from a C corporation to a shareholder are loans:

(1) The extent to which the shareholder controls the

corporation, (2) the earnings and dividend history of the

corporation, (3) the magnitude of the withdrawals and whether a

ceiling existed to limit the amount the corporation advanced, (4)

how the parties recorded the withdrawals on their books and

records, (5) whether the parties executed notes, (6) whether

interest was paid or accrued, (7) whether security was given for

the loan, (8) whether there was a set maturity date, (9) whether

the corporation ever undertook to force repayment, (10) whether

the shareholder was in a position to repay the withdrawals, and

(11) whether there was any indication the shareholder attempted

to repay withdrawals.  Id. at 877 n.7.  Due to the factual nature

of such inquiries, the above factors are not exclusive, and no

one factor is determinative.

Although these factors traditionally have been used in

deciding whether distributions to a shareholder of a C

corporation are loans or dividends, with the exception of the

second factor,[12] the factors are equally applicable to decide

---

[12]    In general, the earnings and profits of a C corporation are
not taxed to its shareholders until the shareholders receive a
dividend.  Secs. 301, 316.  Therefore, in deciding whether a
distribution from a C corporation to a shareholder is a loan or a
dividend, a corporate history of not declaring and paying
dividends in spite of the existence of substantial earnings and
profits weighs on the side of a constructive dividend.  Although
an S corporation is subject to the earnings and profits concept,
                                                    (continued...)

whether withdrawals by a shareholder of an S corporation are loans or distributions that must be included in gross income.

Accordingly, with the foregoing factors in mind, we turn to the facts and circumstances surrounding the withdrawals at issue to determine whether at the time of each withdrawal petitioner entered into a bona fide creditor-debtor relationship with Development.

Petitioner was the president and owner of Development from the time of its incorporation in 1973 until its termination in 1991. Petitioner had complete control of Development and the authority to make decisions as to the timing, amount, and use of the funds he withdrew. Petitioner did not execute any notes to evidence the loans nor provide any security for the withdrawn amounts. Furthermore, the withdrawn amounts were provided without any date for repayment, and Development made no demands for repayment.

---

[12](...continued)
sec. 1371(a)(1), S corporations generally do not produce any current earnings and profits, sec. 1371(c)(1). Furthermore, sec. 1366 provides, in general, that the gross income of an S corporation is included pro rata in the gross income of its shareholders, and sec. 1367 provides the general rule that the basis of each shareholder's stock is increased by the items of S corporation income included in the shareholder's income. Since an S corporation's income is allocated to its shareholders when realized by the corporation, regardless of whether it is actually distributed to the shareholders, the second factor under Alterman Foods, Inc. v. United States, 505 F.2d 873, 877 (5th Cir. 1974), which considers earnings and profits and dividend history, is not generally applicable to S corporations.

Petitioner made more than 40 withdrawals in 1989, more than 70 withdrawals in 1990, and 9 in the first month of 1991.[13] The amounts withdrawn ranged from $350 to $98,753 in 1989,[14] $10 to $166,904 in 1990,[15] and $62 to $12,704 in the first month of 1991. It is clear from the number of withdrawals, the wide range of the amounts withdrawn, and the uses of the withdrawn amounts that petitioner used the corporation as his personal pocketbook from which he could extract funds at will and to which he could deposit funds at his convenience. Moreover, if there was a ceiling on the amounts that petitioner could withdraw, he did not reach it before Development ceased doing business in 1991.

Development recorded the withdrawals on its books and records as loans to petitioner. While this factor does weigh in favor of finding the amounts withdrawn were loans, this factor is not determinative without further evidence substantiating the existence of bona fide loans. Baird v. Commissioner, 25 T.C. 387, 394-395 (1955).

---

[13] The evidence submitted of petitioner's withdrawals from Development is limited to the first month in 1991.

[14] The explanation on Development's books for the $98,753 increase is "Corporation's assumption of stockholder's liability to Winterchase Townhomes, Inc."

[15] The explanation for the $166,904 withdrawal recorded on Development's records is "Transfer of Winterchase lots to Elaine Jones (net of liabilities assumed)." Although the transfer of property was to Mrs. Jones, the amount of the transfer was recorded as an increase (debit) to the loan account.

Development accrued interest at the rate of 10 percent on the withdrawn amounts and increased the loan balance for the amount of the unpaid interest. The accrued interest was reported as S corporation income by petitioners on their returns. Although petitioners' inclusion of the interest income on their returns is a factor that weighs in favor of finding that interest was charged, the fact that no interest actually was paid is a fact that weighs against finding that the withdrawals are loans. The tax savings that would result by reporting the distributions as loans, and then reporting the interest that accrued on the distributions as income, are obvious. Reporting the interest accrued on the loans as income was a relatively painless way for petitioners to give the withdrawals the protective coloration of loans.

Development credited the loan account for petitioner's repayments. Petitioner contends that his "repayments" demonstrate his intention to repay the amounts withdrawn. Usually, a shareholder's repayments are strong evidence that a withdrawal was a loan. The repayments, however, must be bona fide. Crowley v. Commissioner, T.C. Memo. 1990-636, affd. 962 F.2d 1077 (1st Cir. 1992). Petitioner's purported repayments were made in the form of debt assumptions and reclassification of loans as salary which petitioner applied against the outstanding loan balance.

Petitioner alleged that he assumed much of the debt that Development owed to petitioner's other wholly owned corporations. These "assumptions" without actual payments are merely bookkeeping entries designed to give the illusion of repayments. Moreover, with regard to the loan amounts that were reclassified as salary, we are mindful that petitioner had the authority to determine the size of his salary. Petitioner's use of his salary to credit his loan account was simply a bookkeeping entry designed to give his withdrawals the color of loans. Id.

On the basis of our examination of the entire record, we find that petitioner has not established that he entered into a bona fide creditor-debtor relationship with Development at the times of the withdrawals at issue. Petitioner simply used the corporation as his own personal pocketbook, depositing and withdrawing funds at will.

Petitioner argues on brief that, if this Court should find that the withdrawals are not bona fide loans, then the amount of the distributions subject to tax is the net amount by which the distributions over the 3 years at issue exceed the total amount of the repayments made over the same time period. Petitioners cite Epps v. Commissioner, T.C. Memo. 1995-297, and Stovall v. Commissioner, T.C. Memo. 1983-450, affd. 762 F.2d 891 (11th Cir. 1985), as authority for combining the years at issue and taxing the net amount.

Petitioners' reliance on Epps and Stovall as authority for the method of calculating the amount of the annual distributions is well placed.  However, petitioners' interpretation of the holdings in these cases is erroneous.  Federal income tax is computed on the basis of an annual accounting.  Sec. 441; Burnet v. Sanford & Brooks Co., 282 U.S. 359 (1931).  Consistent with annual accounting, Epps and Stovall hold that the distributed amount is the net amount distributed each year, not the net amount distributed over multiple years.  See also Leaf v. Commissioner, 33 T.C. 1093, 1096 (1960) (repayment in later year had no effect on the taxpayer's control over the funds in year at issue), affd. 295 F.2d 503 (6th Cir. 1961).

Thus, the amount distributed by Development to petitioner is the excess of the total amount he withdrew during each year less the amount he paid to the corporation during the same year.[16]

Accordingly, we find that in 1989, 1990, and 1991 the amount that petitioner paid to the corporation in any year in excess of the amount that he withdrew in that year is a contribution to capital, and the amount that he withdrew in any year in excess of the amount that he repaid in that year is taxable to petitioner in accordance with section 1368.  A Rule 155 calculation, made in

---

[16]   Consistent with this calculation, the amount paid to the corporation in excess of the amount withdrawn in any year is a contribution to capital.  See Stovall v. Commissioner, T.C. Memo. 1983-450, affd. 762 F.2d 891 (11th Cir. 1985).

accordance with this holding, will be necessary to determine the net amounts of the distributions.

Finally, in 1991 Development went out of business. We have decided that petitioner's withdrawals were disguised distributions, not loans, and that petitioner's payments in excess of withdrawals, if any, actually were contributions to capital. Therefore, at the time of the corporate dissolution in 1991, the ending balance in the loan account was the same as the beginning balance in 1989, $427,368, plus accrued interest on this amount. Accordingly, we find that upon dissolution petitioner received a distribution in the amount of that indebtedness. See sec. 1.301-1(m), Income Tax Regs.

### Assumption of Development's Indebtedness to INI

Respondent determined that petitioner did not assume Development's indebtedness to INI in 1990. Petitioner asserts that he validly assumed Development's indebtedness to INI in 1990, such that Development owed petitioner $417,978, and petitioner owed INI the same amount.[17]

Morrisett testified that Ricks and he made journal entries transferring Development's indebtedness to petitioner because

---

[17] In determining petitioners' deficiencies for 1989, 1990, and 1991, respondent disallowed all of the debt transfers and assumptions, whether transferred between corporations or between petitioner and a corporation. Petitioner asserts that all of the transfers and assumptions are valid. Our analysis and conclusion regarding the transfer of the $417,978 is equally applicable to the other debt transfers and assumptions disallowed by respondent.

Development was going out of business, and petitioner was "the common factor" among the corporations.

The question before us is whether petitioner actually assumed Development's indebtedness to INI. If petitioner actually assumed Development's indebtedness to INI, a debtor-creditor relationship would have been created between petitioner and INI. Therefore, we think that the factors for determining whether a transfer of money between related parties creates a debtor-creditor relationship are the same factors to use in deciding whether petitioner actually assumed Development's indebtedness to INI.

A transfer of money is a loan for Federal income tax purposes if, at the time the funds were transferred, the transferee unconditionally intended to repay the money, and the transferor unconditionally intended to secure repayment. See supra p. 16.

Thus, for this Court to find that petitioner and INI entered into a valid debtor-creditor relationship, petitioner must prove that at the time of the alleged assumption, he unconditionally intended to repay $417,978 to INI, and that INI intended to unconditionally secure repayment of that amount. Rule 142(a); Welch v. Helvering, 290 U.S. at 115.

The determination of whether a transfer was made with a real expectation of repayment and an intention to enforce the debt depends on all the facts and circumstances including whether: (1)

There was a promissory note or other evidence of indebtedness, (2) interest was charged, (3) there was security or collateral, (4) there was a fixed maturity date, (5) a demand for repayment was made, (6) any actual repayment was made, (7) the transferee had the ability to repay, (8) any records maintained by the transferor and/or the transferee reflected the transaction as a loan, and (9) the manner in which the transaction was reported for Federal tax is consistent with a loan.  See Zimmerman v. United States, 318 F.2d 611, 613 (9th Cir. 1963); Estate of Maxwell v. Commissioner, 98 T.C. 594, 604 (1992), affd. 3 F.3d 591 (2d Cir. 1993); Estate of Kelley v. Commissioner, 63 T.C. 321, 323-324 (1974); Rude v. Commissioner, 48 T.C. 165, 173 (1967); Clark v. Commissioner, 18 T.C. 780, 783 (1952), affd. 205 F.2d 353 (2d Cir. 1953).  The factors are not exclusive, and no one factor controls.  Rather, our evaluation of the various factors provides us with an evidential basis upon which we make our ultimate factual determination of whether a bona fide indebtedness existed.  See Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. at 377.

With those factors in mind, we turn to the facts and circumstances surrounding the transfer of indebtedness at issue to determine whether at the time of the alleged assumption petitioner entered into a bona fide debtor-creditor relationship with INI.

## 1.  Promissory Note or Other Evidence of Indebtedness

Petitioner never signed any promissory note with respect to the debt assumptions at issue.  While it is true that petitioner never executed a note or other singular debt instrument, we do not consider the absence of such an instrument a significant factor in this particular case.  It is quite clear that a valid debt may exist between parties even where no formal debt instrument exists.  Id.  This is particularly true in the case of related parties since formal debt paraphernalia of this type between a shareholder and his wholly owned corporation are not necessary to insure repayment as the case may be between unrelated entities.  Id. at 377-378.

However, petitioner did not introduce any other evidence, e.g., corporate minutes, to substantiate his assertion that he assumed his corporations's indebtedness, or that INI substituted him for Development as the debtor.  We consider this to be a significant factor that weighs against petitioner.

## 2. Interest

Petitioner allegedly assumed Development's indebtedness to INI in two transactions, both of which were recorded by adjusting journal entries on December 31, 1990.  The first amount recorded was $377,800; and the second amount was $40,178.  Neither entry provides any indication that the assumed debt was to bear

interest.[18] Nor is there any evidence that interest was paid or accrued on the indebtedness at issue.

### 3. Security or Collateral for the Transfers

There is no evidence that petitioner provided, or was even requested to provide, any security or collateral for the loans.

### 4. Fixed Maturity Date for Repayment

There was no fixed date for repayment of the assumed debt.

### 5. Demand for Repayment

Although INI's records show that petitioner's indebtedness to INI was substantial,[19] and that INI reported losses and no gross receipts or sales on its returns filed for 1990 and 1991, it apparently made no demand on its largest debtor for payment.

### 6. Actual Repayments

Petitioner offered no evidence, e.g., canceled checks, bank statements, etc., of actual repayment.

### 7. Ability to Repay

Petitioners reported adjusted gross income of $93,164 and $15,010 in 1990 and 1991, respectively, and negative taxable income in both years. Petitioner reported that the balance of

---

[18] The journal entries merely state that the entries "Reclassify amount due from Carl E. Jones Development at 5-31-90 per W/P 143" and "Reclassify the remaining amount due from Carl E. Jones Development at 9-30-90".

[19] In 1989, petitioner's indebtedness to INI was reported on Schedule L of INI's return (Form 1120) as $928,420; in 1990 as $981,202; and in 1991 as $954,026. The loan account was, therefore, 94.06 percent, 99.99 percent, and 97.57 percent of INI's total assets in 1989, 1990, and 1991, respectively.

the loan account on January 1, 1990, before the addition of the amount at issue, was $483,144.

The record does not establish that petitioners' income was sufficient to cover all of their personal living expenses and also to permit them to accumulate sufficient assets to repay the transferred amount. Rather, the ever-increasing reported loan balance is an indication that petitioners' annual income was not sufficient to allow them to maintain their lifestyle and repay their obligations. Therefore, petitioners have not shown that there was a reasonable expectation that they could have repaid the loan from their annual income.

Notwithstanding petitioners' insufficient income as a source of repayment, a review of petitioners' tax returns for the years at issue indicates that they owned substantial rental property which could have been used to repay the amount at issue. There is no indication in the record, however, that the corporation would or could have required petitioners to sell or mortgage those assets for that purpose.

On the record before us, petitioner has failed to establish that he reasonably believed that he would be able to repay the amount at issue on demand.

### 8. Records of Assumption

The only records relating to the assumption at issue are the journal entries.

9.  Reporting the Assumption for Federal Tax Purposes

INI reported the increased amount of the shareholder loan account on its returns for the years at issue.

On the basis of our examination of the entire record, we find that petitioner has not established that he entered into a bona fide creditor-debtor relationship with INI at the time of the transactions at issue.  We therefore sustain respondent's determinations on this issue.

Issue 2.  Whether Petitioner Had Sufficient Basis in Development's Indebtedness to Him To Deduct Pass-Through Losses of $163,487 and $21,022 in 1990 and 1991

Development was indebted to the Carl E. Jones Trust No. 1 (the Trust) for $153,847.  Petitioner "assumed" Development's indebtedness to the Trust by making a journal entry that transferred the liability to him.  Petitioner "paid" the indebtedness by making journal entries offsetting the annuity payments owed him by the Trust against the amount he owed the Trust.  Petitioners reported the annuity income on their joint tax returns for 1989, 1990, 1991, and 1993; however, petitioner did not issue any checks to the Trust or provide any credible evidence to verify that he actually made payments to the Trust.

Development was indebted to Carlsgate for $82,132. Petitioner "assumed" this indebtedness by making a journal entry that transferred the liability to him.  Petitioner "paid" this

amount by decreasing the balance of the account Development maintained for recording the amounts petitioner owed Development.

At the end of Development's 1990 fiscal year, Ricks and Morrisett made journal entries in Development's books that purported to transfer $417,978 of Development's indebtedness to INI to petitioner.

On Schedule L of its 1990 and 1991 U.S. Income Tax Return for an S Corporation (Form 1120S), Development reported that the 1990 ending balance and the 1991 beginning balance in the account it maintained for loans that it received from petitioner was $340,916.

Development incurred losses of $53,084, $163,487, and $21,022 in 1989, 1990, and 1991, respectively. Petitioners deducted these losses on their 1989, 1990 and 1991 returns.

Respondent determined that the balance in Development's account for loans that it received from its shareholders was not the result of an actual economic outlay; rather, the reported amount was the cumulative result in 1990 of petitioner's alleged assumptions of Development's indebtedness to petitioner's other wholly owned corporations. Accordingly, respondent determined that petitioner did not have sufficient basis in Development to deduct the pass-through losses in 1990 and 1991.[20] Specifically,

---

[20] Respondent did not determine that Development did not incur the losses.

respondent determined that petitioner's basis in his stock was consumed by prior year distributions, and that Development was not indebted to petitioner.  (See supra Issue 1 for our holding on the prior year's distributions.)

Petitioner asserts that in 1989 he assumed Development's indebtedness to Carlsgate and the Carl E. Jones Trust No. 1 in the amounts of $82,132 and $153,847, respectively, and that in 1990 he assumed Development's indebtedness to INI in the amount of $417,978.  Petitioner contends that his assumption of Development's indebtedness provided him a basis for taking the losses, but that he had sufficient basis in his stock to deduct the losses without considering his basis in any indebtedness of Development to him.[21]

A shareholder in an S corporation is required to decrease the basis in his S corporation stock (but not below zero) by, among other items, the shareholder's pro rata share of the S corporation's losses and deductions.  Sec. 1367(a)(2)(B) and (C).

Section 1368(d) provides that the adjustments to the shareholder's basis in his stock required by subsections (b) and

---

[21]   Whether petitioner had sufficient basis in his stock in 1990 and 1991 to deduct the losses, without considering his basis in Development's indebtedness to him, is a question of fact.  The record in this case is not sufficient for this Court to compute the basis petitioner had in his Development stock in 1990 and 1991.  That basis must be ascertained by the parties in the Rule 155 computation.  Thus, we limit our finding on this issue to whether petitioner had a basis in Development's indebtedness to him.

(c) of section 1368 for distributions of property to the shareholder shall be applied by taking into account the adjustments to the basis of the shareholder's stock described in section 1367. Thus, the adjustments to the shareholder's basis in his stock for the losses and deductions of the S corporation must be made before the adjustments required for distributions.

If a shareholder's basis in his stock is reduced to zero by the shareholder's pro rata share of the S corporation's losses and deductions, section 1367(b)(2) requires that the amount of the losses and deductions that exceed the shareholder's basis in his stock be applied to reduce (but not below zero) the shareholder's basis in any indebtedness of the S corporation to the shareholder. Sec. 1367(b)(2)(A).

The aggregate amount of the losses and deductions taken into account in determining the tax of a shareholder for any taxable year, however, shall not exceed the sum of the adjusted basis of the shareholder's stock in the S corporation and the adjusted basis of any indebtedness of the S corporation to the shareholder. Sec. 1366(d)(1).

Thus, petitioner's basis in his Development stock would be reduced first for the losses and deductions (but not below zero), and if the losses and deductions exceeded his stock basis, the excess would then reduce petitioner's basis in Development's indebtedness to him (but not below zero). The adjustments to

petitioner's basis in his stock required in each year by section 1368 for distributions of property made to him must be taken into account after the adjustments required by section 1367 for the losses and deductions.

Economic Outlay

Respondent argues that actual economic outlay is required before a shareholder in an S corporation may increase his basis in the corporation for the corporation's indebtedness to the shareholder; that in this case petitioner merely made paper changes in the indebtedness between his corporations and himself; that petitioner failed to show he actually paid out moneys on behalf of Development; and that shifting of journal entries did not leave petitioner in a materially poorer situation. We agree with respondent.

In Underwood v. Commissioner, 63 T.C. 468 (1975), affd. 535 F.2d 309 (5th Cir. 1976), we faced a similar question. In that case the taxpayers, husband and wife, were the sole shareholders of two corporations operating cafeterias specializing in barbecue. One of the corporations, Albuquerque, made an election to be treated as an S corporation. The other corporation, Lubbock, was a C corporation and was very profitable. Lubbock made a series of loans to Albuquerque in return for demand notes bearing 6-percent interest.

In order to increase their basis to be able to absorb the S corporation's losses, Lubbock surrendered the demand notes it was holding, the taxpayers substituted a personal note to replace it, and the S corporation issued a demand note for the same amount to the taxpayers. The net effect was that, after the paper transactions, the taxpayers owed Lubbock for the loan it had originally made to the S corporation, and the S corporation owed money to the taxpayers.

Before the transactions the S corporation had never made any payments of principal or interest on the loans. Sometime later the S corporation paid all of the interest owing to Lubbock. The taxpayers also made an interest payment. A year later the S corporation made another interest payment to Lubbock. Approximately a year after that the taxpayers made another payment for interest and ultimately paid off the loan.

In holding that the transaction did not serve to increase the taxpayers' basis in the S corporation, both the Tax Court and the Court of Appeals for the Fifth Circuit analogized the transaction to a loan guaranty. Furthermore, in affirming the Tax Court decision the Court of Appeals stated:

> In the transaction at issue in this case, the taxpayers in 1967 merely exchanged demand notes between themselves and their wholly owned corporations; they advanced no funds to either Lubbock or Albuquerque. Neither at the time of the transaction, nor at any other time prior to or during 1969 was it clear that the taxpayers would ever make a demand upon themselves, through Lubbock, for payment of their note. Hence, as in the guaranty situation, until they actually

paid their debt to Lubbock in 1970 the taxpayers had made no additional investment in Albuquerque that would increase their adjusted basis in an indebtedness of Albuquerque to them * * *. [535 F.2d at 312; fn. refs. omitted.]

In Estate of Leavitt v. Commissioner, 90 T.C. 206 (1988), affd. 875 F.2d 420 (4th Cir. 1989), we reiterated our position that the guaranty of a loan without actual economic outlay does not increase a shareholder's basis in the corporation. However, the Court of Appeals for the Eleventh Circuit held in Selfe v. United States, 778 F.2d 769 (11th Cir. 1985), that although economic outlay is required to increase a shareholder's basis, it is not always necessary for the shareholder to actually absolve the corporation's debt to pass the test. If the facts demonstrate that in substance the shareholder borrowed funds and advanced them to the corporation, an increase in basis is warranted. The instant case is appealable in the Eleventh Circuit, and we are constrained to follow the law in that circuit. Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). However, the facts of the case before us do not fall within the scope of the Court of Appeals' holding in Selfe.

In Selfe, the shareholders made loan guaranties to disinterested third parties in arm's-length transactions. Clearly, acting as a guarantor in an arm's-length loan with a disinterested party is not the same as interjecting oneself as the middleman in several loan obligations between one's wholly

owned corporations.  See <u>Hitchins v. Commissioner</u>, 103 T.C. 711, 718 & n.8 (1994).  Consequently, the result here is not controlled by the Court of Appeals' opinion in <u>Selfe</u>.

In this case petitioner is attempting to alter his basis in the S corporation by way of journal entries.  There does not appear to be any economic substance to these transactions. Petitioner did not introduce canceled checks, bank account records, or any other evidence to provide verification of actual payment.  Cf. <u>Underwood v. Commissioner</u>, <u>supra</u> at 470-471 (the taxpayer and the corporation exchanged interest-bearing notes, and the taxpayer actually paid interest and principal).  The only evidence of petitioner's assumption and payment of the corporate debt at issue is the journal entries made by Lavantucksin.[22]

Making journal entries attributing indebtedness to petitioner is not equivalent to economic outlay in terms of section 1366(d).  Therefore, we hold petitioner has not met his burden of proving that he had any basis in the indebtedness of Development in 1990 or 1991.  Accordingly, respondent is sustained on this issue.

<u>Issue 3.  Whether Petitioners Had Constructive Dividend Income, or Income From the Forgiveness of Indebtedness of $80,051 in 1989 From Either INI or Spalding</u>

This issue incorporates some of the facts and the holding of <u>INI, Inc. v. Commissioner</u>, T.C. Memo. 1995-112.  For clarity,

---

[22]  Petitioner's payment of $54,369 to Cobb Commercial Bank is not an amount that Development owed to INI.  See <u>supra</u> note 8. Therefore, this payment did not provide him a basis in Development's indebtedness to INI.

however, we begin with a brief summary of some of the facts found therein and also make some additional findings pertinent to this opinion.

As discussed above, Spalding was the 100-percent owner of INI. The consolidated entity through Spalding was a partner in Airport Parking Venture I (Carport Partnership), a general partnership engaged in providing parking services at an airport. On September 30, 1988, as part of their agreement to splitup Spalding and INI, Jones (petitioner in this case) and Cates executed irrevocable voting proxies that deconsolidated Spalding and INI.

In INI, Inc. v. Commissioner, supra, this Court found as fact that pursuant to the Amendment executed on March 1, 1989, Spalding was to dispose of Spalding's interest in the Carport Partnership and transfer to INI $100,000 less one-half of the expense associated with disposing of Spalding's interest in the partnership. Thereafter, Spalding disposed of its interest in the Carport Partnership, and pursuant to the Amendment Spalding paid INI $80,051. Although the payment belonged to INI, respondent introduced evidence at trial in this case which shows that the check for $80,051 was actually made payable to petitioner.

Respondent determined that the $80,051 paid by Spalding to INI was dividend income paid by Spalding to petitioner. At trial, respondent argued that petitioner received the $80,051 as dividend income from either Spalding or INI.

Respondent introduced the copy of the check issued by Spalding Partners, dated March 1, 1989, and made payable to Carl E. Jones for $80,051. Respondent concedes that this same evidence was before the Court in INI, Inc. v. Commissioner, supra. We found in INI, Inc. that petitioner was president of INI, and as of September 29, 1988, its sole director, and that Spalding issued the $80,051 check to INI pursuant to the March 1, 1989, amendment to the agreement to splitup the corporations. There is no evidence that petitioner deposited the check in his personal account or any evidence that petitioner expended the money for his personal benefit. Therefore, although the check is evidence that petitioner actually received the amount at issue, it is not persuasive evidence that petitioner received the check as a shareholder of INI.

Therefore, in conformity with our holding in INI, Inc., we find that although the check was made payable to petitioner, it was payable to him in his capacity as president and director of INI pursuant to the March 1, 1989, amendment to the agreement to splitup the corporations, and that he received it on behalf of the corporation. Accordingly, it is not dividend income to petitioner.

Issue 4. Whether Petitioners Received Constructive Dividends From INI in 1989, 1990, and 1991

As part of the corporate reorganization and separation of Spalding and INI pursuant to section 355, Spalding transferred to INI the account Spalding maintained for the loans it had made to

petitioner.  INI added the balance of the transferred account, $128,429, to the account it maintained to record the amounts INI lent to petitioner for its year ended September 30, 1988.

According to the loan summary prepared by Morrisett, the loan account balance had ballooned to $980,527 on December 31, 1991.  The increase was due largely to petitioner's alleged assumption of his other corporations' indebtedness to INI, capitalized interest, and INI's distributions of property to petitioner that were recorded as loans.

For instance, in 1990 when Carlsgate and Development were going out of business while indebted to INI for $11,374 and $417,978, respectively, petitioner allegedly assumed Carlsgate's and Development's indebtedness.[23]  These alleged assumptions were recorded on the books of INI as increases to the account it maintained to record loans made to its shareholder.  Petitioner did not employ any of the traditional indicia of debt to memorialize the assumptions; the only evidence of the assumptions consists of his testimony and the loan account summary prepared by Morrisett from the journal entries which were made by Lavantucksin at the direction of petitioner.

In November 1990, Mrs. Jones purchased a townhouse (Westfair No. 6) from INI.  The balance due on the townhouse, $34,987, was recorded as an increase to petitioner's loan account in 1991.  INI also distributed a one-half interest in a lot on Spalding

---

[23]  See supra Issue 1.

Drive to petitioner, which was recorded as an increase of $23,718 to the account. In 1991, the loan account was increased by $46,794 for the earlier distribution of a lot on Papermill Road to Mrs. Jones.

In 1989, petitioner as a corporate officer of INI authorized a $175,000 salary payment to himself. INI credited the account it maintained for loans to shareholders for $175,000, issued petitioner a Form W-2 for this amount, and deducted $175,000 as a salary expense on the consolidated return filed by Spalding for the year ended September 30, 1989. Petitioner then changed his mind about taking the $175,000 as a salary payment, and instead decided to take the amount as a loan. To document the reclassification of the amount as a loan, petitioner signed an interest-bearing promissory note dated December 15, 1989, for $175,000. INI reversed the previous journal entries by crediting salary expense and debiting the loans to shareholder account but did not file an amended return to reflect the changed amount of the salary expense.

In preparing their individual income tax return (Form 1040) for 1989, petitioners used a corrected Form W-2 that did not include the $175,000 as salary income.

Respondent determined that petitioner received constructive dividend income from INI of $314,504,[24] $27,298, and $116,163 in 1989, 1990, and 1991, respectively. In each year at issue, the

---

[24] This amount does not include the $80,051 that we found Spalding transferred to INI in 1989. See supra Issue 3.

adjustments to petitioners' income are due to respondent's determination that certain amounts that INI recorded as increases to the shareholder loan account were actually constructive dividends. Petitioners assert that the amounts at issue were loans, not dividends.

In determining the $314,504 constructive dividend income for 1989, respondent included the following as constructive dividend income: $11,075 of cash distributions; $128,429, the transferred shareholder loan account; and $175,000, the reclassified loan.

In determining the $27,298 constructive dividend income for 1990, respondent included distributions of cash and INI's one-half interest in a lot on Spalding Drive, valued at $23,717, as constructive dividends.

In determining the $116,163 constructive dividend income for 1991, respondent included the following as constructive dividends: $1,241 of cash distributions; $46,794, the value of the lot on Papermill Road; and $34,987, the balance due on the townhouse.

In addition, respondent determined that INI ceased doing business in 1991; thus, respondent contends that petitioner received income from the cancellation of indebtedness for the amount of the loan account in that year. Respondent determined that the balance of the account in 1991 was $21,767, or in the alternative if we should decide that the earlier distributions were bona fide loans, respondent contends the balance was

$981,202.  Respondent bears the burden of proving the increased deficiency.  Rule 142(a).

Section 61 defines gross income as income from whatever source derived, including dividends.  Sec. 61(a)(7).  In general, the term "dividend" means any distribution of property made by a corporation out of its earnings and profits of the taxable year or out of its accumulated earnings and profits.  Sec. 316(a). The portion of a distribution of property made by a corporation with respect to its stock which is a dividend shall be included in gross income.  Sec. 301(c)(1).  The portion of the distribution which is not a dividend shall be applied against and reduce the shareholder's adjusted basis in his stock.  Sec. 301(c)(2).  That portion of the distribution which is not a dividend, to the extent it exceeds the basis of the stock, shall be treated as gain from the sale or exchange of property.  Sec. 301(c)(3).

When a corporation confers an economic benefit upon a shareholder, in his capacity as such, without an expectation of reimbursement, that economic benefit becomes a constructive dividend, taxable as such.  Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1214 (5th Cir. 1978).  Accordingly, an expenditure made by a corporation for the personal benefit of its shareholders may result in the receipt of constructive dividends. Ireland v. United States, 621 F.2d 731, 735 (5th Cir. 1980); Nicholls, North, Buse Co. v. Commissioner, 56 T.C. 1225, 1238 (1971).

In determining whether constructive dividends have been received, the key factors are whether the shareholders received economic benefits from the corporation without expectation of payment, and whether the company-provided benefits made available to the shareholders were primarily of a personal nature rather than in the business interests of the corporation. Ireland v. United States, supra at 735; Loftin & Woodard, Inc. v. United States, supra at 1215-1217.

It is undisputed that the distributions of property to petitioner, and to Mrs. Jones through petitioner, provided petitioners economic benefit and served no business purpose of INI. Therefore, for petitioners to exclude the value of the distributed property from their gross income they must prove that INI expected payment for the property petitioners received.

Petitioner asserts that the property (including cash and real property) he and Mrs. Jones received from INI was the proceeds of loans, not dividends. As discussed above in Issue 1, for petitioners to exclude the withdrawals from their income as loans, they must prove that at the time of each withdrawal, petitioner unconditionally intended to repay the amounts received and INI unconditionally intended to require payment. Rule 142(a); Haag v. Commissioner, 88 T.C. at 615-616; Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. at 377; see also Haber v. Commissioner, 52 T.C. at 266; Saigh v. Commissioner, 36 T.C. at 419.

Whether shareholder withdrawals are bona fide loans is a question of fact, the answer to which must be based upon a consideration and evaluation of all surrounding circumstances. Alterman Foods, Inc. v. United States, 505 F.2d at 875.

As its sole shareholder and president, petitioner was in complete control of the corporation. Petitioner made frequent withdrawals of both cash and property, and although the account balance on the records of INI steadily increased to nearly $1 million, there was no apparent ceiling. There was no repayment schedule, no fixed date of maturity, nor any indication that at some future point the sums advanced would be repaid. No interest was ever actually paid, nor was any collateral provided. INI made no systematic effort to obtain repayment, nor did petitioner actually make payments.

Considering the circumstances surrounding the distributions of property, we can find no support for petitioners' assertion that the distributions were loans, not dividends. The sole Alterman Foods factor favorable to petitioners' assertion is that INI apparently did not have current earnings and profits in 1990 and 1991.[25] The fact that a corporation has no current earnings

_____

[25]  In 1989, INI reported taxable income of $23,386. In 1990 and 1991, it reported net losses. This Court is aware that although ordinary tax-accounting principles are applicable to the computation of earnings and profits, there are a number of differences. See, e.g., sec. 1.312-6, Income Tax Regs. Thus, the amount reported by a corporation as its taxable income is not necessarily the same amount as its earnings and profits. Nonetheless, for the years at issue in this case, the adjustments that must be made to taxable income to determine earnings and
(continued...)

and profits is a factor that weighs in favor of the shareholder's argument that the distribution was a loan. The returns filed by INI, however, indicate that it had substantial retained earnings in each of the years at issue from which it could have paid dividends.[26] Therefore, even if INI did not have earnings and profits in 1990 and 1991, that factor is outweighed by all of the other Alterman Foods factors, none of which are favorable to petitioners.

Furthermore, with only one exception, the withdrawals from INI were made without any of the standard indicia of indebtedness. The one exception was the promissory note petitioner signed for $175,000. Petitioner's attempt to change what was initially recorded as a loan into a salary expense, and then back into a loan, is illustrative of the game petitioner was playing with the journal entries. After considering the facts and circumstances, we are convinced that the promissory note for the $175,000 represented nothing other than a strategic move in petitioner's game.

Accordingly, respondent is sustained in the determination that the amounts distributed to petitioner by INI in the years at

---

[25](...continued)
profits either are not present or are inconsequential.

[26] INI reported retained earnings of $528,168, $527,381, and $523,796 in 1989, 1990, and 1991, respectively. This Court is aware that retained earnings are not the same as accumulated earnings and profits, see supra note 25; however, we think the presence of substantial retained earnings is a likely indicator that there are accumulated earnings and profits.

issue were made with respect to its stock and were not loans.

We note, however, that the $128,429 that respondent determined was a dividend received by petitioner in 1989 was not a distribution made by INI. This amount was distributed to petitioner by Spalding, and it was recorded as a loan in an asset account that was transferred by Spalding to INI as part of the division of assets in the splitup of the two corporations.

Respondent did not contend that petitioner did not receive the funds from Spalding as a loan; rather, respondent taxed petitioner on the $128,429 as a constructive dividend from INI in 1989 "because he received the benefit of it" when the corporate division was completed in that year. We do not think that the splitup of INI and Spalding pursuant to section 355 by itself is an event that requires petitioner to recognize a loan he received from Spalding as dividend income from INI. Therefore, we find for petitioner on this adjustment.

### Discharge of Indebtedness

Respondent determined that in 1991 petitioner received $21,767 from INI as income from the discharge of indebtedness. At trial respondent contended in the alternative that if we decided that the earlier distributions from petitioner's corporations were in fact loans, then petitioner had $981,202 of income from the discharge of indebtedness when INI went out of

business in 1991.[27]   Respondent bears the burden of proving the amount of the increased deficiency.   Rule 142(a).

Petitioner contends that INI did not cease doing business in 1991, and that it is a corporation in good standing with the State of Georgia.   Petitioner submits that INI's participation in the earlier case tried before this Court, and in an appeal of our decision in that case to the Court of Appeals for the Eleventh Circuit, is evidence of its business activity.   Furthermore, petitioner contends that the Internal Revenue Service's (IRS) notice of levy issued to INI on June 18, 1992, is evidence that the IRS continues to deal with INI as an active, viable entity. Thus, petitioner asserts that he did not receive income from the discharge of indebtedness in 1991.

Both parties rely on the returns filed by INI for its fiscal years ended 1990 through 1994 to prove their respective positions.

The issue is not whether INI, Inc., was in business in 1991, but whether petitioner received income from the discharge of indebtedness in that year.   The forgiveness of an indebtedness is deemed to have occurred when it becomes reasonable to assume that the debt will probably never be paid.   Exchange Sec. Bank v. United States, 492 F.2d 1096, 1099 (5th Cir. 1974) (cancellation

---

[27]   We have found that the $128,429 of petitioner's indebtedness to Spalding that was transferred to INI in the splitup was not a distribution to petitioner.   Therefore, the balance of the loan account at the end of 1991 was at least $150,196 ($21,767 plus $128,429).

of debt is effective upon agreement, not when removed from books);[28] <u>Bear Manufacturing Co. v. United States</u>, 430 F.2d 152, 154 (7th Cir. 1970) (income is realized when the liability terminates as a practical matter); <u>Fidelity-Philadelphia Trust Co. v. Commissioner</u>, 23 T.C. 527, 530 (1954) (the important consideration is that it was unlikely as a matter of fact that the obligor would have to honor its obligation to the obligee); <u>Estate of Marcus v. Commissioner</u>, T.C. Memo. 1975-9 (the decedent's estate realized income in the year of the decedent's death because the executors did not intend to satisfy certain debts and the creditor's management did not intend to enforce those claims).  For tax purposes, it is well settled that the substance of a transaction as revealed by the evidence as a whole controls over the form employed; i.e., the veil of form is pierced and the entire transaction is carefully scrutinized. <u>Commissioner v. Court Holding Co.</u>, 324 U.S. 331, 334 (1945); <u>Haag v. Commissioner</u>, 334 F.2d 351, 355 (8th Cir. 1964), affg. 40 T.C. 488 (1963).  Thus, we consider the evidence submitted to decide whether in 1991 INI, Inc., intended to enforce repayment of petitioner's indebtedness to it.

On its return filed for fiscal year ended September 30, 1990, INI reported that it had gross receipts of $171,287 and total income of $215,187.  On Schedule L of its return INI reported that at the beginning of the year it had total assets of

---

[28]  See <u>supra</u> note 11.

$983,104; the ending balance was $987,027.  The total asset value was composed of the following assets, and their reported beginning and ending values:  Cash, $886 and $439; other current assets, $414,701 and $11,374; loans to shareholders, $483,144 and $928,420; real estate loans, $70,511 and $46,794; and buildings and other depreciable assets, $13,847 and zero.

The gross receipts and ending balances in the accounts in the fiscal years ending September 30, 1991 through 1995, are as follows:

|  | 1991 | 1992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|---|
| Gross Receipts | -0- | -0- | -0- | -0- | -0- |
| Other income | [3]$57,849 | -0- | [4]$481 | $165,073 | [4]$1,515 |
| Total assets | $981,329 | $977,744 | $970,932 | $945,531 | $918,583 |
| Cash | $127 | -0- | -0- | -0- | -0- |
| Other current assets [1] | -0- | -0- | $1,683 | -0- | $5,302 |
| Real estate loans | -0- | -0- | -0- | -0- | -0- |
| Other investments [2] | -0- | $23,718 | $23,718 | -0- | -0- |
| Loans to shareholder | $981,202 | $954,026 | $945,531 | $945,531 | $913,281 |
| Shareholder loan account percentage | 99.99 | 97.57 | 97.38 | 100.00 | 99.42 |

[1]  Asset account for tax refunds receivable.
[2]  The "other investments" account reflected petitioner's contribution of the one-half interest in the lot on Spalding Drive to INI that the corporation had earlier distributed to petitioners, and that had been recorded as a $23,718 increase to the loan account.  Petitioner agreed to contribute this property to INI after a meeting with respondent's agent, Carolyn Hill, about a tax liability from a prior year in which Spalding and INI filed a consolidated return.  Petitioner treated the contribution as a $23,718 loan payment.  We have found that the earlier distribution of the property to petitioner was not a loan. Consistent with that finding, we hold that petitioner's return of the property to the corporation was a contribution to capital. The lot was sold in 1994 to pay the tax liability from the

consolidated filing year, and INI reported a long-term capital gain of $165,073 from the sale.

[3] Capital gain income of $56,630 from the sale of the Westfair Townhouse No. 6 to Mrs. Jones; and other income of $1,219.

[4] Income from State tax refund.

Although INI reported that its business purpose is real estate development, it is clear from examining INI's returns that since 1990 its only activities have been settling tax liabilities, disposing of business assets, and holding petitioner's loans. Furthermore, it has earned no gross receipts, and its only income has been from the sale of its assets and the return of previously deducted taxes. Moreover, the reported amount of petitioner's indebtedness to INI as well as its value relative to INI's other assets has remained very high. In fact, petitioner's loan account is almost its only asset. For instance, the reported value of the loans as a percentage of the total value of its assets was 94.06, 99.99, 97.57, 97.38, 100, and 99.42 percent for fiscal years ending 1990, 1991, 1992, 1993, 1994, and 1995, respectively.

In deciding whether INI, Inc., intended to enforce repayment of the funds advanced petitioner, we need not decide whether INI, Inc., has gone out of business. It is clear from the evidence that INI's purpose in remaining in existence is to wind up its affairs and retain petitioner's loans on its books of account. Upon consideration of all the facts and circumstances of this case, we do not find the fact that INI, Inc., retained petitioner's loans on its books of account persuasive evidence that it intended to enforce repayment of the amounts it advanced

to petitioner.  To the contrary, the evidence as a whole shows that it is very unlikely that the debt will ever be paid.

Accordingly, we find that petitioner has not met his burden of proving that he did not receive income from the discharge of indebtedness in 1991, and that respondent has met the burden of proving the increased deficiency.

Issue 5.  Whether Petitioners Realized a Short-Term Capital Loss in 1991

Development sold a house to Ben (Ben) and Kathy (Kathy) Johnson (the Johnsons), taking back a note.  On September 30, 1990, Development distributed the note it took on the sale to petitioner, recording the distribution as a $22,000 increase to the shareholder loan account.

Petitioners reported a loss of $28,248 on Schedule D of their 1991 Individual Income Tax Return (Form 1040) as the total of three separate losses:  A nonbusiness bad debt loss of $14,500 from Ben Johnson; a loss of $7,249 from "J. Bradley"; and a loss of $6,499 from "Ext Wall Vent".

Respondent determined that the $28,248 loss was not allowable because petitioners did not establish that the items were worthless or that petitioners incurred any loss for that year.  Petitioners assert that the reported items are losses from nonbusiness bad debts that became worthless during the taxable year and are deductions that are allowable under section 166.

Section 166(a) provides there shall be allowed as a deduction any debt that becomes worthless during the taxable

year.  The amount of the deduction for a bad debt is limited to the taxpayer's adjusted basis in the debt as provided by section 1011.  Sec. 166(b); Perry v. Commissioner, 92 T.C. 470, 477-478 (1989), affd. without published opinion 912 F.2d 1466 (5th Cir. 1990).

Section 166(d)(1)(B) provides that where any nonbusiness bad debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 1 year.

There is no standard test or formula for determining worthlessness within a given taxable year; the determination must depend upon the particular facts and circumstances of the case. Crown v. Commissioner, 77 T.C. 582, 598 (1981); sec. 1.166-2(a), Income Tax Regs.  However, it is generally accepted that the year of worthlessness is to be fixed by identifiable events which form the basis of reasonable grounds for abandoning any hope of recovery.  Crown v. Commissioner, supra.  The taxpayer bears the burden of proving that the debt had value at the beginning of the taxable year and that it became worthless during and prior to the end of that year.  Millsap v. Commissioner, 46 T.C. 751, 762 (1966), affd. 387 F.2d 420 (8th Cir. 1968).

Petitioners offered no testimony or evidence about the losses from "J. Bradley" or "Ext Wall Vent" that they reported on their return.  Rather, in describing the loss at trial,

petitioner attributed the entire reported amount, $28,248, to the Johnsons' default.

Petitioner testified that in selling the house to the Johnsons, he took back a second mortgage of approximately $33,000, which was payable in three annual installments, and that the Johnsons defaulted after making the first payment. Petitioner further testified that he pursued collection of the debt owed him by the Johnsons, and that he obtained a $40,000 judgment against Ben and a $20,000 judgment against Kathy, which he recorded in the counties where the Johnsons now reside.

Petitioner relies on only his testimony to carry the burden of proving the loss; he failed to produce any corroborating evidence to support his testimony. Thus, the issue is one of credibility wherein we must determine the extent to which the proffered testimony is believable. See Schad v. Commissioner, 87 T.C. 609, 620 (1986), affd. without published opinion 827 F.2d 774 (11th Cir. 1987). It is well established that we are not required to accept self-serving testimony in the absence of corroborating evidence. Niedringhaus v. Commissioner, 99 T.C. 202, 212 (1992); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Moreover, the rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable to him. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). This is particularly true

where, as here, petitioner's testimony at trial does not agree with the return that he filed.

The unexplained inconsistency between petitioner's testimony and the return, coupled with his failure to produce any corroborating evidence of his alleged collection activities, casts doubt upon petitioner's credibility. Furthermore, petitioner's testimony that he sold the house and took the note is contrary to Development's records, which show Development sold the house and later distributed the note to him. Thus, there is no credible evidence of petitioners' basis in the note, if any, or that they suffered losses in the amounts from the sources they reported on their return.

On the basis of the entire record, we simply do not believe that petitioners suffered the losses they reported. We find, therefore, that petitioners have not met their burden of proving they actually incurred any losses. We hold that respondent is sustained on this determination.

Issue 6. Whether Petitioners Are Liable for an Accuracy-Related Penalty Pursuant to Section 6662 for 1989, 1990, and 1991.

Respondent determined that petitioners are liable for an accuracy-related penalty pursuant to section 6662 for 1989, 1990, and 1991. Respondent asserts that the section 6662 penalty is due to either a substantial understatement of tax, or negligence or disregard of rules or regulations. Sec. 6662(b)(1) and (2). Petitioners assert that they are not liable for the section 6662 penalty because for all of the years at issue their returns were

prepared by reputable certified public accountants to whom they disclosed all relevant facts.

Section 6662(a) imposes a penalty in an amount equal to 20 percent of the portion of the underpayment of tax attributable to one or more of the items set forth in subsection (b). The accuracy-related penalty does not apply with respect to any portion of the underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. Sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor is the extent of the taxpayer's effort to assess its proper tax liability for the year. Id.

Petitioners contend that the accuracy-related penalty is inappropriate in this case because they relied on their certified public accountant, Ricks, to prepare their tax returns accurately. Generally, the duty of filing accurate returns cannot be avoided by placing the responsibility on a tax return preparer. Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987). However, reliance on a qualified adviser may demonstrate reasonable cause and good faith if the evidence shows that the taxpayer relied on a competent tax adviser and provided the adviser with all necessary and relevant information. Jackson v. Commissioner, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521

(10th Cir. 1989); <u>Daugherty v. Commissioner</u>, 78 T.C. 623, 641 (1982); <u>Magill v. Commissioner</u>, 70 T.C. 465, 479 (1978), affd. 651 F.2d 1233 (6th Cir. 1981); <u>Pessin v. Commissioner</u>, 59 T.C. 473, 489 (1972).

Under section 1.6664-4(b)(1), Income Tax Regs., circumstances that may establish reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of the experience, knowledge, and education of the taxpayer. Reliance on the advice of a professional (such as an attorney or an accountant) does not necessarily demonstrate reasonable cause and good faith. Reliance on professional advice constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. <u>Id.</u>

The record shows that petitioner directed Lavantucksin to make certain journal entries on the corporate records which Ricks and Morrisett then used to prepare the returns. Morrisett testified that he used the journal entries made by Lavantucksin to reconcile the corporate books with petitioner's personal books, but he did not verify the entries with bank statements, canceled checks, the corporate minutes, or other external sources. Therefore, the accountants unreasonably relied on uncorroborated journal entries prepared at petitioner's direction. Under these circumstances, petitioners' reliance on the accountants was not reasonable.

Furthermore, petitioner's failure to provide his accountants all of the necessary and relevant information is an indication that he did not make an effort to assess the proper tax liability for each of the years at issue.

On the basis of the record as a whole, we conclude that petitioners have not carried their burden of proving that they acted with reasonable cause and in good faith. We hold that petitioners are liable for the accuracy-related penalty under section 6662 for 1989, 1990, and 1991.

Issue 7.  Whether Mrs. Jones Qualifies Under Section 6013(e) as an Innocent Spouse

Mrs. Jones contends that she is not liable for the understatement of tax because she qualifies as an innocent spouse pursuant to section 6013(e).

Spouses who file a joint return generally are jointly and severally liable for its accuracy and the tax due, including any additional taxes, interest, or penalties determined on audit of the return. Sec. 6013(d). However, section 6013(e) provides an exception. A spouse (commonly referred to as an innocent spouse) is relieved of tax liability if that spouse proves:  (A) A joint return was filed for the years in issue; (B) the return contained a substantial understatement (defined in section 6013(e)(3) as any understatement over $500) of tax attributable to grossly erroneous items of the other spouse; (C) in signing the return, the spouse seeking relief did not know, and had no reason to know, of the substantial understatement; and (D) it would be

inequitable to hold the relief-seeking spouse liable for the deficiency attributable to the understatement.  Sec. 6013(e)(1); Flynn v. Commissioner, 93 T.C. 355, 359 (1989).

For purposes of section 6013(e)(1)(B), section 6013(e)(2) defines the term "grossly erroneous items" to mean, with respect to any spouse, (A) any item of gross income attributable to such spouse that is omitted from gross income, and (B) any claim of a deduction, credit, or basis by the spouse in an amount for which there is no basis in fact or law.[29]  There is no basis in law or fact if the claim is fraudulent, phony, frivolous, or groundless. Feldman v. Commissioner, 20 F.3d 1128, 1135 (11th Cir. 1994), affg. T.C. Memo. 1993-17; Russo v. Commissioner, 98 T.C. 28, 32 (1992).  The disallowance of an item is not, in and of itself, proof of the lack of basis in fact or law.  Feldman v. Commissioner, supra; Russo v. Commissioner, supra.

The spouse seeking relief bears the burden of proving that each of the four requirements has been satisfied.  Rule 142(a); Stevens v. Commissioner, 872 F.2d 1499, 1504 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Russo v. Commissioner, supra at 31-32; Sonnenborn v. Commissioner, 57 T.C. 373, 381 (1971).  Failure to prove any one of the four statutory requirements will prevent

---

[29]  If the items are claims of deduction, credit, or basis, the tax liability attributable to these items must exceed a certain percentage of the spouse's 1992 adjusted gross income; i.e., the preadjustment year.  Sec. 6013(e)(4).  See Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993).

innocent spouse relief.  Stevens v. Commissioner, supra; Bokum v. Commissioner, 94 T.C. 126, 138-139 (1990), affd. 992 F.2d 1132 (11th Cir. 1993).

The parties have stipulated that petitioners filed a joint return for the years at issue, and respondent concedes that except for the distributions of property that were ultimately received by Mrs. Jones, the omissions from income are attributable to petitioner.[30]

Thus, the controversy herein focuses on three items:  (1) Whether the substantial understatement is attributable to grossly erroneous items; (2) whether Mrs. Jones did not know, and had no reason to know, of the substantial understatement when she signed the return in each of the years at issue; and (3) whether it would be inequitable to hold Mrs. Jones liable for the income tax deficiency attributable to such substantial understatement.

We conclude that the omissions of the corporate distributions from income are grossly erroneous items, but that the claim for the bad debt deduction is not a grossly erroneous item; that Mrs. Jones knew or had reason to know of the understatements when she signed the returns; and that it is not inequitable to hold her liable for tax.

---

[30]  Respondent concedes that except for the Winterchase lots and the lot on Papermill Road, which were transferred to Mrs. Jones, and the income from the cancellation of the debt owed on the Westfair townhouse, the omitted income items are attributable to petitioner.

Grossly Erroneous Items

To be entitled to relief as an innocent spouse, Mrs. Jones must show that it the substantial understatement of tax is attributable to grossly erroneous items. Sec. 6013(e)(1)(B).

Respondent concedes that, except for certain distributions of property, the items of omitted income are attributable to petitioner. Therefore, these items are grossly erroneous. Sec. 6013(e)(2)(A).

However, we find that the claimed deduction in 1991 for the bad debt loss is not a grossly erroneous item. In order to be a grossly erroneous item, deductions must have been claimed without any basis in fact or law. Deductions disallowed for lack of substantiation are not per se "grossly erroneous". Douglas v. Commissioner, 86 T.C. 758, 763 (1986).

Mrs. Jones has not shown that the deductions disallowed by respondent were disallowed for the reason that the losses had never in fact been incurred or that there was no basis in law for the deductions. The deductions were disallowed solely for lack of substantiation. Petitioner testified about the Johnsons' default but offered no evidence regarding losses from "J. Bradley" and "Ext Wall Vent". Petitioner maintained throughout that the Johnsons had defaulted on the note, and that he had sought payment and attempted collection, but other than petitioner's testimony, there was no evidence to substantiate the claim. The understatement of tax attributable to the claim for

the bad debt loss, therefore, is not due to a grossly erroneous item. Accordingly, Mrs. Jones is not entitled to innocent spouse status with regard to this adjustment.

### Knowledge of Understatements on the Returns

To be entitled to relief as an innocent spouse, Mrs. Jones must show that, in signing the joint returns for the years in issue, she did not know and had no reason to know of the substantial understatements of tax. Sec. 6013(e)(1)(C).

In Stevens v. Commissioner, supra, the Court of Appeals for the Eleventh Circuit, in refusing to grant innocent spouse relief, approved our application of its "reason to know" standard. The Court of Appeals stated that the "reason to know" standard is based on whether a "reasonably prudent taxpayer under the circumstances of the spouse at the time of signing the return could be expected to know that the tax liability stated was erroneous or that further investigation was warranted." Id. at 1505; see also Sanders v. United States, 509 F.2d 162 (5th Cir. 1975). The test establishes a "duty of inquiry" on the part of the alleged innocent spouse. Stevens v. Commissioner, supra. As pointed out in Mysse v. Commissioner, 57 T.C. 680, 699 (1972), a spouse cannot close her eyes to facts that might give her reason to know of unreported income. Furthermore, the alleged innocent spouse's role as homemaker and complete deference to the husband's judgment concerning the couple's finances, standing alone, are insufficient to establish that a spouse had no "reason to know." Stevens v. Commissioner, supra at 1506.

In deciding whether Mrs. Jones had "reason to know" of the substantial understatements when she signed the returns, we take into account: (1) Her level of education; (2) her involvement in the family's business and financial affairs; (3) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending pattern; and (4) the culpable spouse's evasiveness and deceit concerning the couple's finances. Kistner v. Commissioner, 18 F.3d 1521, 1525 (11th Cir. 1994), revg. T.C. Memo. 1991-463; Stevens v. Commissioner, 872 F.2d 1499 (11th Cir. 1989). The foregoing factors are considered "because, ordinarily, they predict what a prudent person would realize regardless of the other spouse's evasiveness or deceit." Bliss v. Commissioner, 59 F.3d 374, 379 (2d Cir. 1995), affg. T.C. Memo. 1993-390.

Petitioners reported that they had $49,976 of taxable income in 1989 and negative taxable income in 1990 and 1991. In 1990 and 1991, Mrs. Jones received the Winterchase lots and the Papermill Road property, which had fair market values of $166,904 and $46,794, respectively, and the balance due on her townhouse, $34,987, was effectively canceled. Petitioners did not report the value of these distributions as income on the joint returns they filed in 1990 and 1991.

Mrs. Jones was not involved in the day-to-day operation of petitioner's business; however, she was 50-percent owner of Carlsgate Properties, Inc., an S corporation, and had been the owner of her own decorating business, Delane's Decorating

Service. Although Mrs. Jones testified that she had never been a professional decorator, she listed "Decorator" as her occupation on each return for the years at issue. Therefore, in considering her level of education, we find that Mrs. Jones had a practical education in business.

Furthermore, petitioners concede that petitioner did not prevent Mrs. Jones from examining the returns, dominate or abuse her, or otherwise coerce her into signing the returns. Cf. Kistner v. Commissioner, supra at 1527 (a reasonably prudent taxpayer living an affluent life for many years, fearful of physical violence, and uninvolved in the financial affairs of the business, at the time of signing the return could not be expected to know that the tax liability stated was erroneous or that further investigation was necessary).

We think that a reasonably prudent person would have inquired how she could receive distributions of valuable real estate free of encumbrances without reporting them as income. Mrs. Jones had reason to know that the tax liability stated was erroneous or that further investigation was warranted.

Not Equitable To Hold Mrs. Jones Liable

To be entitled to relief as an innocent spouse, Mrs. Jones must show that it would be inequitable to hold her liable for the deficiencies in tax for the years at issue. Sec. 6013(e)(1)(D).

In deciding whether it is inequitable to hold a spouse liable for a deficiency, we consider whether the purported innocent spouse significantly benefited beyond normal support,

either directly or indirectly, from the unreported income.
Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg.
T.C. Memo. 1992-228; Belk v. Commissioner, 93 T.C. 434, 440
(1989); Purcell v. Commissioner, 86 T.C. 228, 440 (1986), affd.
826 F.2d 470 (6th Cir. 1987); sec. 1.6013-5(b), Income Tax Regs.
Evidence of direct or indirect support may consist of transfers
of property, including transfers which may be received several
years after the year in which the omitted income should have been
included in gross income.  Sec. 1.6013-5(b), Income Tax Regs.

Mrs. Jones contends that she did not enjoy any economic
benefit beyond normal support, either directly or indirectly,
from the substantial understatement of income by her husband.  In
support of her contention, Mrs. Jones points to the fact that
during the years at issue she drove an older model Mercedes with
over 100,000 miles on it, and at the time of trial she was
driving an older model Mercedes with approximately 240,000 miles
on it.  Furthermore, in contrast to the $900,000 house she and
petitioner owned until September of 1991, at the time of trial
she and petitioner were living in a house for which they paid
$325,000.

Although Mrs. Jones may now have a less affluent standard of
living than she had during the years at issue, it is not true
that she did not significantly benefit from the understatements
on petitioners' 1989, 1990, and 1991 returns.  In 1990 and 1991,
Mrs. Jones received the Winterchase lots and the Papermill Road
property, which had fair market values of $166,904 and $46,794,

respectively, and the balance due on her townhouse, $34,987, was effectively canceled.  These transfers exceed normal support.

Furthermore, sometime between September of 1991 and May of 1992, petitioner transferred $150,000 to Mrs. Jones, which she had in a bank account in her name at the time of trial.  Mrs. Jones cites Terzian v. Commissioner, 72 T.C. 1164 (1979), as support for her contention that the receipt of a lump-sum payment in the nature of support from her husband does not preclude the grant of innocent spouse relief.

We agree with Mrs. Jones that a payment in the nature of ordinary support is not an equitable bar to innocent spouse relief.  However, the facts in Terzian which led this Court to conclude in that case that a spouse's one-time transfer of $155,000 to the taxpayer was for ordinary support are not present in the instant case.  At the time of trial in that case, Mrs. Terzian had been separated from her husband, Dr. Terzian, for more than 2 years and had a suit for divorce pending against him that became final shortly after the trial concluded.  In the divorce proceeding no claim for alimony was made, and none was awarded.  Id. at 1165 n.2, 1172.  In his answer to the taxpayer's complaint for divorce, Dr. Terzian alleged that he had transferred funds to the taxpayer for support.  Id. at 1172 n.4.

Moreover, at the time of trial, Mrs. Terzian had spent $20,000 of the transferred funds for living expenses and in connection with her daughter's education.  Finally, Mrs. Terzian

had a very modest lifestyle; she and her daughter were living in a small two-bedroom apartment with a rent of $275 a month.

On the basis of the record, we concluded in <u>Terzian</u> that the $155,000 was a one-time transfer to the taxpayer of an amount in lieu of alimony or support and that these funds would not provide a woman of the taxpayer's age and lack of business experience with more than ordinary support throughout the remainder of her life. <u>Id.</u> at 1172. In contrast, in the case at hand, there is no evidence that the transfer was made in lieu of support or alimony, or that Mrs. Jones has, or will ever, use the transferred funds for ordinary support.

We conclude that Mrs. Jones is not an innocent spouse under section 6013(e).

<u>Decision will be entered</u>

<u>under Rule 155</u>.