# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-IA-01158-SCT

*DEBORAH GAYLE THORNTON WEST*

*v.*

*CHARLES TIMOTHY WEST*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 7/8/2002 |
| TRIAL JUDGE: | HON. FRANKLIN C. McKENZIE, JR. |
| COURT FROM WHICH APPEALED: | JONES COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | PATRICK F. McALLISTER |
| | WILLIAM B. PEMBERTON, II |
| ATTORNEYS FOR APPELLEE: | JOHN V. ESKRIGGE |
| | JAMES A. BECKER, JR. |
| | EDWARD L. CARLISLE |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | REVERSED AND REMANDED - 12/02/2004 |
| MOTION FOR REHEARING FILED: | 8/25/2004 |
| MANDATE ISSUED: | |

## EN BANC.

## WALLER, PRESIDING JUSTICE, FOR THE COURT:

¶1.     Treating Deborah Gayle Thornton West's Motion for Clarification as a Motion for

Rehearing, the Motion for Rehearing is granted.  The prior opinion is withdrawn, and this

opinion is substituted therefor.

¶2.     This family law case concerns a property settlement agreement between former spouses

Charles Timothy West (Tim) and Deborah Gayle Thornton West (Debbie).   Over five years

after the court approved the property settlement agreement and the parties had abided by its terms, Tim stopped complying with the agreement. Debbie brought a contempt action against Tim, and after a bench trial the chancellor court voided certain provisions of the agreement, ordering that the parties resubmit the alimony issue to the court. Debbie sought an interlocutory appeal which this Court granted.

## FACTS

¶3. Tim and Debbie were married on July 28, 1979. They had three children during their marriage. Tim and Debbie divorced in November 1994 after filing a Joint Complaint for Divorce that incorporated a property settlement agreement. Over five years after the divorce, Tim stopped paying what was due pursuant to the property settlement agreement. Debbie then filed a contempt proceeding. Tim argued that the alimony and division of marital assets provisions in the property settlement agreement were ambiguous.[1]

---

[1] The provisions which Tim states are ambiguous are, in pertinent part, as follows:

ARTICLE II. It is the intention of the Husband and the Wife to benefit and share equally the employment and business income of Husband without regard to the marital status of the parties to each other or to a third party. Husband shall pay to Wife bi-weekly periodic payments of One-half of husband's income, which at present is $1,458.54 . . . beginning May 1, 1994, and one-half of net monthly Director's fee which is $500.00, and continuing until the earliest to occur of the death of either or if the parties should divorce then this support would become fixed, lump sum installment alimony based upon the present amount together with one-half of increases, payable until Wife's seventh [sic] (70) birthday, which payments will not be terminated, reduced or otherwise affected by the remarriage of either party but will terminate upon the death of the Wife, if prior to age seventy (70). The bi-weekly payments shall increase or decrease annually in accordance with the Husband's total salary to provide for bi-weekly payments equal to one-half (½) of Husband's monthly salary from West Quality Food Service, Inc. or substituted business/employer. For purposes of this agreement, Husband's "monthly salary" shall be defined as the gross

2

¶4.    In the middle of the trial, the chancellor wrote to counsel informing them of his initial thoughts on the case.  He stated:

1.    The Property Settlement Agreement in this case can only be described as "[a] [i]nvitation to [l]itigation."  It is  ambiguous and contradicts itself in certain respects.

2.    Mrs. West's claim that she is entitled to alimony based upon K-1 filings where no actual cash distribution was received by Mr. West is ludicrous and will not be sustained by the Court.

3.    As to division of "marital assets," the [a]greement fails to define what they are.  The term "marital assets" is now clearly defined by *Ferguson* and *Hemsley* and their progeny.  Prior to those cases, Mississippi was a "title state."

4.    Assuming that Mrs. West became vested with an equitable interest in 50% of Mr. West's ownership of stock or other interest in the family

taxable salary or wages paid to husband from West Quality Food Service, Inc., or substituted business/employer, less amounts withheld from such salary or wages for payment of premiums on insurance covering the minor children of the parties. . . .

ARTICLE III (H).   Husband agrees and hereby acknowledges that Wife is entitled to and shall be vested with one-half (½) of all existing marital assets, including, but not limited to, stocks, limited partnerships and business assets. Both parties also acknowledge, however, the existing contractual restrictions on the major business assets of Husband which presently prevent immediate transfer.   Husband agrees to promptly transfer one-half (½) of those assets as and when they become restricted; or if they are sold, conveyed, transferred, surrendered, exchanged, or otherwise disposed of by Husband, then Husband will immediately pay one-half (½) of the proceeds, remunerations or other considerations to Wife.

* * *

Husband acknowledges, and it is the intention of both parties, to make a present transfer to Wife of one-half (½) vested equitable ownership interest in said properties as a division of marital assets, while married, and this Agreement constitutes an existing equitable lien to Wife of one-half (½) of said properties.

3

business as a marital asset, I question whether she could claim entitlement to a sum greater than the value of those interests as of the date of the agreement. Any enhanced value after the date of that agreement would not constitute a "marital asset."

5. Although the alimony provision of the agreement mentions business income, it goes on to specify salary or wages, bonus and director fees as the specific items to be included. As a general rule of contract construction, specific language controls and limits general language within a contract.

6. Although the Court has not yet seen the specific restrictions on transfer of Mr. West's stock in the family business, the Court is very familiar with those type restrictions. And if those restrictions are as broad as some I have prepared as a lawyer, Mrs. West will never realize anything out of that stock ownership unless those businesses are sold by consent of all the stockholders.

¶5. After a trial on the controversial provisions, the chancery court entered its judgment, finding certain provisions of the agreement were conflicting and confusing, that it was unable to resolve the differences, that there was no meeting of the minds between the Wests as to the alimony provision of the agreement, and that, in the absence of an agreement between the parties, the issue should be presented anew to the court.

¶6. Tim filed a Motion for Amendment to Judgment, to Make Additional Findings, and/or for a New Trial on Certain Issues. Debbie then filed a Motion for Entry of Findings and Conclusions, to Alter or Amend Judgment or, Alternatively, for a New Trial. Debbie then filed a Motion for Certification Pursuant to M.R.C.P. 54(b), Alternatively, for Leave to File an Interlocutory Appeal Pursuant to M.R.A.P. 5. The chancery court issued an interlocutory order denying Debbie's Motion for Rule 54(b) Certification, her Motion for Interlocutory Appeal, and Tim's Motion for a New Trial. The trial court also stated in its interlocutory order that the provisions in question were "unconscionable, constitute[d] illegal escalation clauses, [were]

4

incapable of understanding, and [were] unenforceable due to the confusing, ambiguous, and contradictory language contained therein."

¶7.    We granted Debbie's petition for permission to appeal from the interlocutory order. *See* M.R.A.P. 5.

## STANDARD OF REVIEW

¶8.    Our standard of review for all appeals involving domestic relations matters is limited. We will not disturb the findings of a chancellor unless the chancellor was "manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Perkins v. Perkins*, 787 So. 2d 1256, 1260 (Miss. 2001).

## DISCUSSION

¶9.    Debbie raises six issues in her appeal.  First, whether the trial court erred in voiding the alimony and division of marital assets provisions of the property settlement agreement.[2] Second, whether the trial court erred in failing to determine that $411,000 in corporate loans made to Tim were distributions to which Debbie was entitled under the property settlement agreement.  Third, whether the trial court erred in failing to determine that Tim breached his obligation to Debbie under their pre-divorce death benefit agreement.  Fourth, whether Debbie is entitled to attorneys fees for the contempt action and subsequent appeal.  Fifth, whether the trial court lacked jurisdiction to determine alimony and division of marital assets anew in the

---

[2]Debbie raises the related issues of whether the trial court erred in concluding that the alimony and division of marital property assets provisions of the property settlement agreement are ambiguous, unconscionable, and contain illegal escalation clauses.  These issues are subsumed into the general issue of whether the trial court erred in voiding the alimony and division of marital assets provision of the property settlement agreement.

absence of the parties' voluntary written consent. And sixth, whether the trial court erred in granting Tim's motion to quash Debbie's subpoenas of West Quality documents.

### I. Validity of the Property Settlement Agreement

### A. Does Rule 60 Apply?

¶10. Mississippi Rule of Civil Procedure 60(b) allows relief "[o]n motion and upon such terms as are just" from a judgment or order in a limited number of circumstances including any "reason justifying relief from the judgment." M.R.C.P. 60(b)(6) (emphasis added). Debbie argues that Rule 60 does not allow Tim to challenge the chancery court's judgment over five years after it was entered. However, Tim's Counterclaim for Relief was merely a response to Debbie's contempt action, not a motion for relief from a judgment or order, and we therefore find that Rule 60 is wholly inapplicable to this case.

### B. Ambiguity

¶11. Both parties make numerous arguments about whether the agreement is ambiguous. Debbie argues that the parties simply agreed to equally divide Tim's business and employment income so that both parties would receive the same annual net income. Tim argues the property settlement agreement provisions are ambiguous and offers as an example the provision that, upon the divorce of the parties, the periodic alimony will change to lump sum installment alimony; yet the amount of the lump sum is not specified.

¶12. "[S]ettlement agreements entered into by divorcing spouses and judicially approved under our Irreconcilable Differences Divorce Act become a part of the decree and enforceable as such as though entered by the court following contested proceedings." *Bell v. Bell*, 572 So. 2d 841, 844 (Miss. 1990) (citation omitted). When the Irreconcilable Differences Divorce

Act has been complied with, the custody, support, alimony, and property settlement agreement becomes a part of the final decree for all intents and purposes. *Switzer v. Switzer*, 460 So. 2d 843, 845 (Miss. 1984). If the agreement is sufficient to comply with the statute, that is enough to render it a part of the final decree of divorce as if the decree had been rendered by the chancery court following a contested divorce proceeding. *Id*. at 846.

¶13. "[P]roperty settlement agreements are contractual obligations." *In re Estate of Hodges*, 807 So. 2d 438, 442 (Miss. 2002). The provisions of a property settlement agreement executed prior to the dissolution of marriage must be interpreted by courts as any other contract. *Id*. at 445. In *East v. East*, 493 So. 2d 927, 931-32 (Miss. 1986), we held "[a] true and genuine property settlement agreement is no different from any other contract, and the mere fact that it is between a divorcing husband and wife, and incorporated in a divorce decree, does not change its character."

¶14. We have delineated a three-tiered process for contract interpretation. *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 351 (Miss. 1990). First, we look to the "four corners" of the agreement and review the actual language the parties used in their agreement. *Id.* at 352. When the language of the contract is clear or unambiguous, we must effectuate the parties' intent. *Id.* However, if the language of the contract is not so clear, we will, if possible, "harmonize the provisions in accord with the parties' apparent intent." *Id.* Next, if the parties' intent remains uncertain, we may discretionarily employ canons of contract construction. *Id.* at 352-53 (citing numerous cases delineating various canons of contract construction

7

employed in Mississippi). Finally, we may also consider parol or extrinsic evidence if necessary. *Id.* at 353.

¶15. The three-tiered approach is not a "rigid 'step-by-step' process." *Id.* at 351 n.6. "Indeed, overlapping of steps is not inconceivable." *Id.* We further note that, when examining the contractual provisions of property settlement agreements, special deference is afforded such agreements. As we have stated:

> In property and financial matters between the divorcing spouses themselves, there is no question, that absent fraud or overreaching, the parties should be allowed broad latitude. When the parties have reached agreement and the chancery court has approved it, we ought to enforce it and take a dim view of efforts to modify it, as we ordinarily do when persons seek relief from their improvident contracts.

*Speed v. Speed*, 757 So. 2d 221, 224-25 (Miss. 2000).

¶16. The alleged uncertainty in Tim and Debbie's property settlement agreement can primarily be dealt with by analyzing the agreement under the first and third tiers of Mississippi contract construction process. First, in looking at the "four corners" of the agreement, we note that the general purpose of the agreement was for Tim to provide one-half of his various forms of income to Debbie, regardless of their marital status to each other or to a third party. As to marital property, the agreement states that Debbie is entitled to one-half of all existing marital assets, including, but not limited to, stocks, limited partnerships, and business assets. This provision clearly manifests an intent that Tim and Debbie equally share all marital assets. Other provisions of the property settlement agreement equitably divide the parties' respective entitlements to the marital dwelling, husband's residence, automobiles, household furnishings, and personal effects.

8

¶17. The only remaining assets within the parties' definition of marital assets are Tim's interests in various West family businesses. During the course of the marriage and at the time of divorce, Tim owned stock interests in West Quality Food Services, Inc. and Coastal Express, Inc. He also held limited partnership interests in West Leasing Company, West Brothers Leasing Company, and West Family Leasing Company. Pursuant to the terms of the property settlement agreement, Debbie is entitled to equally share these assets, and she is authorized to review financial information (including any corporate documents relating to distribution or salary) which would positively or negatively affect her agreed entitlement to his various forms of income.

¶18. But even if, as Tim argues, certain portions of the property settlement agreement are ambiguous, analysis under the third tier of the Mississippi contract construction process allays almost all questions about the alleged uncertainty in the contract. Nothing demonstrates the overall clarity of Tim and Debbie's agreement more plainly than the simple fact that they managed to comply with the agreed property settlement agreement for over five years before Tim decided he would no longer respect the agreement. However vague, unintelligible, and contrary to his original intent Tim may now try to cast the substantive provisions of the property settlement agreement, the extrinsic evidence of his compliance with the provisions for nearly a decade eviscerates this argument of any credibility.

¶19. Reading the agreement as a whole and considering the intentions of the parties, we find that the Wests' property settlement agreement is unambiguous inasmuch as it addresses the marital property, Tim's income, and Debbie's access to financial information regarding Tim's various forms of income. However, what remains unclear is whether the trial court ordered

an award of lump sum or periodic alimony. As noted above, Tim points out that one of the provisions of the agreement states that, upon the divorce of the parties, the periodic alimony will change to lump sum installment alimony; yet the amount of the lump sum was not specified. Instead, the trial court ordered Tim to pay Debbie alimony that, rather than awarding a fixed amount, gave Debbie a percentage based upon Tim's income at the time of the payment.

¶20. In Mississippi there are four types of alimony: periodic, lump sum, rehabilitative, and reimbursement. *Guy v. Guy*, 736 So. 2d 1042, 1046 (Miss. 1999). We must look to the substance, rather than the label, to determine whether alimony is periodic or lump sum. *Hubbard v. Hubbard*, 656 So. 2d 124, 129 (Miss. 1995).

¶21. Periodic alimony is monthly alimony awarded on the basis of need. *See generally Cunningham v. Lanier*, 589 So. 2d 133, 136-37 (Miss. 1991). As a general rule, periodic alimony has no fixed termination date; instead, it automatically terminates at the death of the obligor or the remarriage of the obligee. *East*, 493 So. 2d at 931. Periodic alimony may be modified or even terminated subsequent to the decree awarding alimony in the event of a material change of circumstances. *Taylor v. Taylor*, 392 So. 2d 1145, 1147 (Miss. 1981). However, we have previously stated that "[w]here a party is unable to comply with a divorce decree, he should with reasonable promptitude, make the fact known to the court by proper petition and have the decree modified or suspended, and not wait until he has been cited for contempt." *Brown v. Gillespie*, 465 So. 2nd 1046, 1048 (Miss. 1985). Failure to petition the court requires, in response to the citation for contempt, that the party make out a clear case of inability. *Id*. (citing *Redding v. Redding*, 167 Miss. 780, 150 So. 776 (1933)). The

10

alimony only vests when payment becomes due. ***Brand v. Brand***, 482 So. 2d 236, 237-38 (Miss. 1986).

¶22.   Lump sum is a fixed and irrevocable amount, used either as alimony or as a part of property division. ***Wray v. Wray***, 394 So. 2d 1341, 1345 (Miss. 1981); ***Smith v. Little***, 834 So. 2d 54, 57-58 (Miss. Ct. App. 2002). It may be payable in a single lump sum or in fixed periodic installments and is a final settlement between husband and wife. ***Creekmore v. Creekmore***, 651 So. 2d 513, 518 (Miss. 1995). A specific period of time for which payments are to run and a fixed sum of money are two characteristics of lump sum alimony. ***Id.*** Even though a situation in which payments of lump sum alimony "may give said payments a superficial similarity to payments of periodic alimony, . . . said fact does not change the vested, non-modifiable nature thereof." ***McDonald v. McDonald***, 683 So. 2d 929, 931 (Miss. 1996). Unless it is clear from the record what sort of alimony award is given, we must construe the alimony as being periodic and not lump sum. ***In re Estate of Hodges***, 807 So. 2d at 442; ***Hubbard v. Hubbard***, 656 So. 2d 124, 130 (Miss. 1995); ***Sharplin v. Sharplin***, 465 So. 2d 1072, 1073 (Miss. 1985).

¶23.   As Tim points out, the trial court's original order refers to the award as lump sum in name, but then appears to describe a periodic alimony award. Whether the award is lump sum or periodic is of utmost importance in the instant action, because it determines which legal standard applies. That is, knowing which type of alimony has been given indicates that either (1) Tim's conduct was possibly excusable in the case of periodic alimony if he can prove there was a material change in circumstances which clearly resulted in an inability to pay; or (2)

11

Tim's refusal to pay was positively inexcusable in the case of a lump sum award, because the agreement then constitutes an irrevocable, vested interest to which Debbie was entitled, regardless of any change in circumstances. In light of the fact that the original order and the record do not clarify what type of award the trial court gave, we must resolve this ambiguity by deeming the alimony award as periodic.

¶24. Tim and Debbie entered into a court-approved contract regarding the disposition of their marital property, and they peaceably abided by it for over five years. The language of the property settlement agreement, intent of the agreement, and parol evidence of the parties' conduct demonstrate that the language of the contract is unambiguous in regard to the provisions covering the marital property, Tim's income, and Debbie's access to financial information regarding Tim's various forms of income. In regard to the provisions which confuse the issue of what type of alimony award Debbie was actually given, we find the chancellor was correct inasmuch as he found those provisions to be ambiguous, but incorrect in wholly eviscerating the alimony and division of marital assets provisions. That limited part of the property settlement agreement which is unclear we resolve with the application of case law which deems the award periodic alimony.[3]

### C. Unconscionability

¶25. The chancellor concluded that the provisions in question were unconscionable but stated no reasons for this conclusion. Tim's allegations of unconscionability are principally

---

[3]In accord with this holding and our case law regarding periodic alimony, the chancellor must now determine whether Tim's refusal to comply with the agreement was excusable due to a material change in circumstances. *Taylor v. Taylor*, 392 So. 2d 1145, 1147 (Miss. 1981).

based on his argument that, despite the fact that he agreed to give Debbie 50% of his diverse forms of income, the reality is that as a result of tax consequences, he is shouldering more than his share of the pecuniary burden under the agreement.

¶26. A contract may be either procedurally or substantively unconscionable. Procedural unconscionability goes to the formation of the contract. *East Ford, Inc. v. Taylor*, 826 So. 2d 709, 714 (Miss. 2002). Substantive unconscionability occurs when the terms of the agreement are so one-sided that no one in his right mind would agree to its terms. *In re Johnson*, 351 So. 2d 1339, 1341 (Miss. 1977).

¶27. Tim makes no concrete allegations that he was mislead in the formation of the agreement. Furthermore, Tim's general allegations of procedural unconscionability are not convincing to us since he is a sophisticated businessperson who was represented by counsel at the time he signed the agreement. Substantively, the terms of the property settlement agreement are less than desirable, but we cannot say that no spouse in his or her right mind would agree to what is, at worst, a begrudging but generous offer on Tim's part to provide alimony to Debbie after divorce. The terms are neither procedurally nor substantively unconscionable.

### D. Escalation Clause

¶28. The chancellor also concluded that the pertinent provisions "constitute[d] illegal escalation clauses." Though the chancellor did not explain his conclusion, we assume that his qualms regarded the provision that "bi-weekly payments shall increase or decrease annually in accordance with the [h]usband's total salary . . . ." Tim argues, as he did in regard to

13

unconscionability, that he never intended the tax consequences of the property settlement agreement to result in Debbie getting a better deal out of the agreement.

¶29.   We have held that "escalation clauses should be included in property settlement agreements." *Speed*, 757 So. 2d at 225 (citing *Wing v. Wing*, 549 So. 2d 944 (Miss. 1989)). Escalation clauses in property settlement agreements are enforceable absent fraud, overreaching, or mistake, even though one party may, in the future, find that he or she entered into the agreement imprudently.  *Speed*, 757 So. 2d at 227.

¶30.   The property settlement agreement appropriately contained an escalation clause, protecting both Debbie and Tim in the case that Tim's salary fluctuates during the prescribed time for payment of alimony.  Tim has presented no hard evidence of fraud, overreaching, or mistake.  He may have entered into the agreement improvidently, but even if he did so, improvident decisions do not provide a basis with which to characterize an escalation clause as being illegal.

¶31.   This agreement reflects a deliberate and thorough division of the Wests' marital assets. It is largely unambiguous, and the conflicting provisions which are ambiguous we resolve by holding that the alimony award is periodic.  The agreement is not unconscionable, and it does not contain an illegal escalation clause.  To find otherwise circumvents the express language of the agreement.  The chancellor erred by failing to appropriately enforce the property settlement agreement.

### II.      *The $411,000.00 Loan, Death Benefit Agreement, and Attorneys Fees*

¶32.   Debbie argues that in erroneously finding the property settlement agreement unenforceable, the chancellor consequently failed to address property settlement agreement-

14

related issues including whether, under the property settlement agreement, Debbie was entitled to a portion of the $411,000.00 in "loans" from West Quality to Tim, whether Tim breached his obligation to Debbie under a pre-divorce death benefit agreement, and whether Debbie was entitled to attorneys fees on her contempt action and for fees she incurred on appeal.

¶33.    In Mississippi, "an appellant is not entitled to raise a new issue on appeal, since to do so prevents the trial court from having an opportunity to address the alleged error." *Crowe v. Smith*, 603 So. 2d 301, 305 (Miss. 1992).  We decline to rule on issues the trial court has not addressed and abstain from any discussion regarding the death benefit agreement or attorneys fees.  However, we later discuss the issue of the $411,000.00 "loan" from West Quality to Tim in conjunction with our discussion of the chancellor's grant of the Motion to Quash the subpoenas duces tecum served by Debbie.

### III.    *Jurisdiction*

¶34.    Debbie argues that the chancellor lacked jurisdiction to try the issues in question, either initially or anew, without the parties' express written consent.  She cites Mississippi Code Annotated Section 93-5-2(3) for the proposition that, without her written consent, the trial court had no right to interpret a property settlement agreement which it had already approved.  Debbie misinterprets the consent requirement of the irreconcilable differences statute.  The written consent requirement addressed in the statute requires that a court have the written consent in the *original* irreconcilable divorce action before deciding property rights between the couple.  Miss. Code Ann. § 93-5-2(3) (Rev. 2003).  This issue is without merit.

### IV.    *Findings of Fact and Conclusions of Law*

15

¶35. Unless the evidence is overwhelming, it is reversible error for the trial court to refuse, upon request by a party to the litigation, to make specific findings of fact and separately state the conclusions of law on which its decision is based. *Lowery v. Lowery*, 657 So. 2d 817, 819-20 (Miss. 1995); *see* M.R.C.P. 52 (a) ("In all actions tried upon the facts without a jury the court may, and shall upon the request of any party to the suit . . . find the facts specially and state separately its conclusions of law[.]"). Debbie argues that the chancery court abused its discretion by failing to enter findings of fact and conclusions of law regarding its judgment and subsequent order after both she and Tim requested that it do so. However, our reversal of the chancellor's decision is dispositive of this issue, eliminating any need we may have otherwise had to review his findings of fact and conclusions of law. We therefore decline to address this issue.

### V. *Motion to Quash*

¶36. Debbie argues that Tim violated the property settlement agreement in failing to inform her of a West Quality transaction resulting in a realization of positive income for Tim.[4] In an

---

[4]After stating the general requirements for how Tim's income will be divided between him and Debbie, the property settlement agreement provides that:

> Wife shall be kept currently informed of the business affairs of all corporations, partnerships and other business interests in which Husband is currently interested or involved as of the date of this Agreement for so long as Husband's interest is maintained, in whole or in part, including but not limited to corporate minutes, equivalent partnership information, personal net worth statements of Husband; personal state and federal income tax returns . . . all major business decisions and all proposals to sell or dispose of any interest in any such business or related venture. It shall be deemed that Wife has been kept currently informed if periodic information is provided by such corporations, partnerships or other business interests of the Husband at least quarterly, unless circumstances dictate, and Wife requests, more frequent reporting of business information. However, Husband shall not be obligated to provide information which would breach any fiduciary duty of the Husband to such corporations or

16

itemized response to Debbie's request for financial information regarding Tim's assets, dated September 13, 1996, Tim's attorney stated that his only corporate loan from West Quality was for the purchase of a vehicle. However, a December 31, 1999 document mentioned a $439,211.00 debt owed by Tim to West Quality without specifying the source of liability. Furthermore, in a West Quality Food Services schedule of notes receivable for officers and employees, listed under Tim's name were $411,000.00-worth of loans going back to December 16, 1994, a month after Tim and Debbie agreed to the property settlement agreement.[5]

¶37. After unsuccessfully attempting to obtain financial information regarding Tim's involvement in the West Family business by way of routine discovery, Debbie issued subpoenas duces tecum to the West family business entities regarding twenty-nine categories and 17,000 pages of financial information, including "[e]ach loan made to and each loan obtained from each stockholder." The West entities filed a joint motion to quash Debbie's subpoenas and set hearing one week before trial. At the hearing before the trial judge, Debbie's attorney attempted to mention the necessity of, among other pieces of information, the documents regarding potentially misleading "loans." The following discussion ensued:

> MR. PEMBERTON [Debbie's attorney]: We want to know what Tim West makes, and the reason that we need to know everything that's on there is to ensure that certain entries that are made in the presentations given to us are uniform throughout the accounting for all of the shareholders. If he is receiving [special] treatment, Your Honor.

---

partnerships which are imposed by state law or other rule of law.

[5]Debbie alleges that she did not receive this document until "shortly before trial," but nothing in the document indicates when she received it.

THE COURT: Why don't you just ask them that question? . . .

MR. PEMBERTON: We would prefer to see the source.

THE COURT: Well, I understand you would prefer to see all that. But you ask that question first before you file a subpoena asking for all of this detailed information . . .

¶38. Pemberton then told the court that everyone he had deposed, including Tim, had been unable to provide him with the information. As Pemberton attempted to explain the necessity of the documents in regard to the loan, Tim's attorney interrupted to say:

MR. BECKER: Your Honor, might I remark that David [Childress], the chief financial officer of the companies, has been deposed for about a half day. He explained how the payments were made, that they were all on an equal basis, et cetera, insofar as what they did. . . . We've given them all the records, all of his income tax returns, everything else that he would be relying on, what the IRS relies on, what these people are relying on insofar as payments made to him, benefits he received. They have it all.

MR. PEMBERTON: That is incorrect, Your Honor. Insofar as the characterization of what he's -

THE COURT: Let me just tell you right now, let me tell you right now. I've told you what you're entitled to know from Mr. Becker's client. You can depose the company's chief financial officer and get the information you want to get about the salary of Tim West, the dividends he makes, whether or not he has transferred any interest in the shares of stock in the company on their books. You can get all that information by deposition. But insofar as this subpoena that you have served on these companies, to me it's outrageous. I'm going to quash the subpoena.

* * *

MR. PEMBERTON: We're saying we can't determine his total income from those income tax records, that we need to look at the books and determine what perks were provided to the office.

18

THE COURT: . . . [U]nless you can convince me that when they furnish that information to you they're lying, then I'm not going to open that can of worms.

¶39.    With scant documentation available to prove the validity of Debbie's argument regarding Tim's financial dealings, she was left to rely on testimony from Tim and his witnesses.   Tim had no information to offer in the way of repayment terms or the interest rate on the alleged loans.   He did admit that he had made no payment on the loans, though he planned on paying them "someday."   At one point during his testimony, Tim made an unsolicited comment which shed light on his intentions for repayment as well as the possibility that a loan agreement might not exist.   He said, "I'm not going to sign off on a piece of paper anywhere and make intentions to make payments to her or anybody else that I can't pay back.   And I can't pay back money that I don't have."

¶40.    Tim claimed that the loans were merely intended to provide financial assistance to Coastal Express, a struggling entity related to West Quality, and there was documentation to back up his claims.   After being reminded that Debbie had not been provided with the documents to which Tim had referred, he replied, "[Y]ou know, you asked me for confidential documents from a corporation and some of the Board members took offense to that."

¶41.    At trial, Tim's expert also testified that the loans were merely used to provide extra capital to Coastal Express.   Contrary to Tim's testimony, David Childress, chief financial officer of West Quality, testified that Tim had, in fact, made payments on the loan.   He also testified that payment for the loans would be charged against him with interest.

¶42.    In its final judgment, the trial court stated:

> It is difficult for a [c]hancellor to perform an in-depth study of the property settlement agreements which come before them [sic]. Chancellors do not have the staff nor the time to gather information from the parties, analyze it, have it reviewed by CPA's to determine its actual effect and then call the parties before them to explain to them what they have agreed to.

¶43. The trial court subsequently held that the property settlement agreement was void, ruling that the issue of alimony needed to be presented anew to the chancellor.

¶44. Trial court decisions regarding discovery are subject to review for abuse of discretion. *DeBlanc v. Stancil*, 814 So. 2d 796, 798 (Miss. 2002). We have held that a "[husband or] wife, in respect of [his or] her right to maintenance or alimony, [are] within the protection of statutes or the rule avoiding conveyances or transfers in fraud of creditors or other persons to whom the maker is under legal liability; and this is so irrespective of whether the conveyance or transfer was made before, and in anticipation of the [husband or] wife's suit for maintenance or alimony, or pending the suit, or after a decree has been made in the [husband or] wife's favor." *Blount v. Blount*, 231 Miss. 398, 413-14, 95 So. 2d 545, 552 (1957). Although in the past, this precedent has typically applied in cases where the conveyance of the property in question originates with one of the spouses, we find that the law is applicable in a situation where the offending spouse is on the receiving end of a conveyance of property to which the other spouse appears reasonably entitled under a maintenance or alimony agreement.

¶45. Courts consider a variety of factors in determining whether an advance to a shareholder is a dividend or a loan. *Alterman Foods, Inc. v. United States*, 505 F.2d 873, 877 n.7 (5th Cir. 1974). These factors include

> (1) the extent to which the shareholder controls the corporation; (2) the earnings and dividend history of the corporation; (3) the magnitude of the advances; (4) whether a ceiling existed to limit the amount the corporation

20

advanced; (5) whether or not security was given for the loan; (6) whether there was a set maturity date; (7) whether the corporation ever undertook to force repayment; (8) whether the shareholder was in a position to repay the advances; and (9) whether there was any indication the shareholder attempted to repay the advances.

*Id.* (citations omitted); *see Estate of Sell v. Comm'r of Internal Revenue*, 64 T.C.M. (CCH) 304 (1992) (citing *Alterman* factors); *see also Crowley v. Comm'r of Internal Revenue*, 962 F.2d 1077, 1079 (1st Cir. 1992) (listing similar litany of factors to consider in determining whether distribution constituted loan, rather than constructive dividend).

¶46. Although the *Alterman* factors have traditionally been used in the context of distributions to a shareholder in a C corporation, "with the exception of the second factor, the factors are equally applicable to decide whether withdrawals by a shareholder of an S corporation are loans or distributions that must be included in gross income." *Jones v. Comm'r of Internal Revenue*, 74 T.C.M. (CCH) 473 (1997) (footnote omitted).[6]

¶47. Analysis of the alleged loan in question under the *Alterman* factors reveals that, in quashing Debbie's subpoena for documents regarding West Quality's financial dealings, the chancellor made impossible a determination of whether or not the West Quality transfer to Tim was a loan or a distribution. First, Tim owns 24% of West Quality, and the remaining interests in the West businesses are owned by West family members. As noted above, the second factor does not apply to West Quality since it is an S corporation. Third, a

---

[6]The Tax Court explained that "[s]ince an S corporation's income is allocated to its shareholders when realized by the corporation, regardless of whether it is actually distributed to the shareholders, the second factor under *Alterman Foods, Inc. v. United States*, 505 F.2d 873, 877 (5th Cir. 1974), which considers earnings and profits and dividend history, is not generally applicable to S corporations." *Jones v. Comm'r of Internal Revenue*, 74 T.C.M. (CCH) 473 n.12 (1997).

21

$411,000.00 advance is certainly one of great magnitude. Fourth, there is no documentation in the record indicating whether a ceiling existed to limit the amount the corporation advanced Tim. Fifth, there is no documentation in the record regarding whether or not security was given for the loan; although the Tim's testimony indicates that security very likely was not given. Sixth, there is no documentation in the record as to whether there is a set maturity date for the loan; although Tim's testimony indicates that no such date exists. Seventh, there is no documentation in the record as to whether the corporation has undertaken to force repayment; although the testimony of Tim and his witnesses indicates that the corporation has not done so. Eighth, Tim's testimony indicates that he is not in a position to pay back the loan; however, his 1999 statement of financial condition states that his net worth is $5,123,764.00 This evidences an ability to at least begin making some payments on the "loan." Ninth, Tim has admitted he has made no attempt to pay back the advances from West Quality.

¶48. The chancellor abused his discretion in refusing to require disclosure of the underlying business documents with respect to the loan. Simply ruling that Debbie could get all the financial information she needed by way of deposition did not satisfy her discovery requests. In contentious proceedings involving complex finances of such great magnitude, it is not sufficient to simply tell one party to rely on the self-interested assertions of their opponent and his witnesses. Doing so eviscerates the aggrieved party of the ability to make a substantive showing of its case.

¶49. As noted above, in light of the fact that the chancellor did not decide whether the $411,000.00 was a loan or distribution, that issue is not before us and we decline to rule on it. We reverse the chancellor's decision to quash Debbie's subpoenas duces tecum and remand

to the trial court with instructions that it reconsider the motion to quash and rule as to each of the twenty-nine categories of financial information, granting Debbie access to those documents revealing financial information (including any corporate documents relating to distribution or salary) which would positively or negatively affect her agreed entitlement to Tim's various forms of income. We note that Debbie is still bound by the rules of relevance in regard to discovery, and her requests for documentation should be evaluated by the trial court in light of those standards.[7]

## CONCLUSION

¶50. We reverse the chancellor's decision voiding the property settlement agreement provisions at issue and its conclusion that those provisions are unconscionable and contain illegal escalation clauses. We also reverse the decision concluding the provisions are ambiguous in their entirety, finding that the agreement is unambiguous in regard to the provisions covering the marital property, Tim's income, and Debbie's access to financial information regarding Tim's various forms of income; and the conflicting provisions which are ambiguous we resolve by holding that the alimony award is periodic. We instruct the trial court, on remand, to consider whether Tim acted in contempt of the property settlement agreement. In examining whether Tim was in contempt of the agreement, the trial court must

---

[7]Mississippi Rule of Civil Procedure 26(b)(1) states that parties may obtain evidence by way of discovery "regarding any matter, not privileged, which is relevant to the issues raised by the claims or defenses of any party." The rule also states that evidence is discoverable which "appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* We note in accord with the agreement that only if the financial information requested would positively or negatively affect Debbie's agreed entitlement to Tim's various forms of income would it be calculated to, in the words of the comment to Rule 26(b)(1), further the policy of "favor[ing] limitations, rather than expansions, on permissible discovery."

23

consider, among other issues: (1) whether there was a material change in circumstances which clearly resulted in an inability to pay, justifying Tim's refusal to pay periodic alimony to Debbie; (2) whether, under the property settlement agreement, Debbie was entitled to a portion of the $411,000.00 in "loans" from West Quality to Tim; (3) whether Tim breached his obligation to Debbie under a pre-divorce death benefit agreement; and (4) whether Debbie was entitled to attorneys fees on her contempt action and for fees she incurred on appeal. Finally, we reverse the chancellor's decision to quash Debbie's subpoenas duces tecum and remand to the trial court with instructions that it reconsider the motion to quash and rule as to each of the twenty-nine categories of financial information, granting Debbie access to those documents revealing financial information (including any corporate documents relating to distribution or salary) which would positively or negatively affect her agreed entitlement to Tim's various forms of income.

¶51.    **REVERSED AND REMANDED.**

**SMITH, C.J., COBB, P.J., EASLEY, CARLSON AND DICKINSON, JJ., CONCUR. DIAZ, GRAVES AND RANDOLPH, JJ., NOT PARTICIPATING.**